REMBERT v RYAN'S FAMILY STEAK HOUSES, INC

Docket No. 196542. Submitted June 1, 1998, at Lansing. Decided April 9, 1999, at 9:15 A.M. Leave to appeal sought.

John Rembert brought an action in the Genesee Circuit Court against Ryan's Family Steak Houses, Inc., his employer, and another, seeking damages for race discrimination under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, and handicap discrimination under what is now known as the Persons With Disabilities Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.* The plaintiff thereafter resigned from his employment and amended his complaint to include claims of constructive discharge and intentional infliction of emotional distress. The court, Geoffrey L. Neithercut, J., after finding that the plaintiff had failed to establish that he was incompetent to understand the arbitration agreement that he had signed at the time of his employment, granted summary disposition for the defendants on the basis that the claims raised by the plaintiff were subject to, and thus barred by, the arbitration agreement. The plaintiff appealed. The Court of Appeals, CORRIGAN, C.J., and GRIFFIN and HOEKSTRA, JJ., in an opinion released December 2, 1997, affirmed the trial court's order with respect to the claims of constructive discharge and intentional infliction of emotional distress, but reversed the trial court's order with respect to the two statute-based discrimination claims on the basis of the holding of the majority in *Rushton v Meijer, Inc (On Remand)*, 225 Mich App 156 (1997), which was binding precedent pursuant to MCR 7.215(H). The panel further indicated that in the absence of the requirement that it follow the holding of the majority in *Rushton*, it would have affirmed the order of the trial court for the reasons set forth in Judge (now Justice) TAYLOR's opinion in *Rushton*. 226 Mich App 822 (1997). By its order of December 16, 1997, the Court of Appeals vacated the December 2 opinion and convened a special panel pursuant to MCR 7.215(H) to resolve the conflict between the position taken by the panel in this case and the position taken by the majority in *Rushton*. 226 Mich App 821 (1997).

After consideration by the conflict resolution panel, the Court of Appeals *held*:

1. The Michigan Legislature, by enacting the Michigan arbitration act, MCL 600.5001 *et seq.*; MSA 27A.5001 *et seq.*, has expressed a

strong public policy favoring private voluntary arbitration, and Michigan courts have historically enforced agreements to arbitrate disputes. Michigan law has upheld predispute agreements to arbitrate statutory claims where the agreements have not diminished the effect of the statute.

2. Because of this state's strong public policy favoring arbitration, predispute agreements to arbitrate statutory employment discrimination claims are valid if there is a valid binding contract to arbitrate the statutory claims, the statute itself does not prohibit an agreement to arbitrate claims under the statute, the arbitration agreement does not waive the substantive rights and remedies set forth in the statute, and the arbitration procedures are fair so that an employee may effectively assert the statutory rights.

3. If an agreement to arbitrate a statutory employment discrimination claim does not waive any statutory rights and provides a procedurally fair method of resolving such claims, it is reasonable as a matter of law and is not an unenforceable contract of adhesion. Accordingly, on remand the trial court must make findings of fact concerning whether the agreement in this matter waives any statutory rights and provides a procedurally fair method of resolving the statutory claims.

4. Neither the Civil Rights Act nor the Persons With Disabilities Civil Rights Act contains a provision that precludes an employer and employee from entering into a predispute agreement to arbitrate employment discrimination claims that may arise under those acts. Further, because the Michigan arbitration act gives broad approval to arbitration agreements and expressly excludes collective labor contracts and certain real estate disputes from its provisions while containing no similar exclusion with respect to statutory employment discrimination claims, the act implicitly includes agreements to arbitrate employment discrimination claims within the scope of its provisions.

5. In order to ensure that an employee has a fair opportunity to vindicate effectively any statutorily protected rights, a predispute agreement to arbitrate employment discrimination claims must give clear notice to the employee that the right to adjudicate discrimination claims in a judicial forum is being waived and that such claims will be arbitrated, must inform the employee of the right to representation by counsel, must provide that the arbitration proceedings will be before a neutral arbitrator, must provide for reasonable discovery, and must provide for a fair arbitral hearing. Fairness does not require that the employer must pay the fees of an arbitrator or an arbitration service.

6. Judicial review of an arbitral award is pursuant to the provisions of MCR 3.602(J)(1), which provides for the vacation of an award where, among other things, the arbitrator has exceeded the powers granted to the arbitrator. The powers granted to the arbitrator are exceeded where the arbitrator makes an error of law that is so material or so substantial as to have governed the award and but for which the award would have been substantially otherwise. To allow for sufficient review, arbitral awards must be in writing and contain findings of fact and conclusions of law.

Remanded.

CAVANAGH, J., dissenting, stated that the decision of the trial court that direct judicial construction of the statutory claims was precluded by the predispute arbitration agreement should be reversed because Michigan's longstanding public policy entitling persons seeking to protect their civil rights to direct review of their claims by the courts cannot be abrogated by contract.

1. ARBITRATION — EMPLOYMENT DISCRIMINATION — EMPLOYMENT CONTRACTS — AGREEMENT TO ARBITRATE.

Predispute agreements to arbitrate statutory employment discrimination claims are valid if there is a valid binding contract to arbitrate the statutory claims, the statute itself does not prohibit an agreement to arbitrate claims under the statute, the arbitration agreement does not waive the substantive rights and remedies set forth in the statute, and the arbitration procedures are fair so that an employee may effectively assert the statutory rights.

2. ARBITRATION — CIVIL RIGHTS ACT — PERSONS WITH DISABILITIES CIVIL RIGHTS ACT — EMPLOYMENT CONTRACTS — AGREEMENT TO ARBITRATE — PUBLIC POLICY.

An agreement in an employment contract requiring any subsequent dispute involving a claim under the Civil Rights Act or the Persons With Disabilities Civil Rights Act to be submitted to binding arbitration is not contrary to any express provision of either act and is not contrary to the public policy of the state of Michigan (MCL 37.1101 *et seq.*, 37.2101 *et seq.*; MSA 3.550[101] *et seq.*, 3.548[101] *et seq.*).

3. ARBITRATION — EMPLOYMENT DISCRIMINATION — EMPLOYMENT CONTRACTS — AGREEMENT TO ARBITRATE — CONTRACTS OF ADHESION.

An agreement to arbitrate a statutory employment discrimination claim that does not waive any statutory rights and provides a procedurally fair method of resolving such a claim is reasonable as a matter of law and is not an unenforceable contract of adhesion.

4. ARBITRATION — EMPLOYMENT CONTRACTS — EMPLOYMENT DISCRIMINATION — AGREEMENT TO ARBITRATE.

An agreement in an employment contract to arbitrate any subsequent employment discrimination claims that may arise must give clear notice to the employee that the right to adjudicate discrimination claims in a judicial forum is being waived and that such claims will be arbitrated, must inform the employee of the right to representation by counsel, must provide that the arbitration proceedings will be before a neutral arbitrator, must provide for reasonable discovery, and must provide for a fair arbitral hearing; fairness does not require that the employer must pay the fees of an arbitrator or an arbitration service.

*Stark and Gordon* (by *Sheldon J. Stark* and *Carol A. Laughbaum*) and (*Kenneth Ivan Brown*, of Counsel), for the plaintiff.

*Bodman, Longley & Dahling LLP* (by *Diane L. Akers*, and *Paul R. Bernard*), for the defendants.

Amici Curiae:

*Jeffrey S. Reuble* and *Miller, Canfield, Paddock and Stone, P.L.C.* (by *Charles S. Mishkind*), for Meijer, Inc.

*Jackson, Lewis, Schnitzler & Krupman* (by *Stephen X. Munger* and by *J. Steve Warren* and *Stephen F. Fisher*), for Employment Dispute Services, Inc.

*Clark Hill P.L.C.* (by *Duane L. Tarnacki* and *J. Walker Henry*), for Michigan Manufacturers Association.

*Dykema Gosssett PLLC* (by *Laurence D. Connor* and *Rosemary G. Schikora*) and *Richard L. Hurford*, for Masco Corporation, Masco Tech, and TriMas.

*Patrick L. Rose, Thomas Donnellan, Sheldon J. Stark*, and *Michael J. Steinberg*, for American Civil Liberties Union Fund of Michigan.

*Amberg, McNenly, Zuschlag, Firestone and Lee,
P.C.* (by *Joseph H. Firestone*), for Michigan Education
Association.

*Sachs, Waldman, O'Hare, Helveston, Bogas &
McIntosh, P.C.* (by *John R. Runyan, Jr., Mary Kathe-
rine Norton,* and *Elizabeth A. Cabot*), for Michigan
State AFL-CIO, International Union UAW, and Wolver-
ine Bar Association.

*Kelman, Loria, Simpson, Will, Harvey & Thomp-
son* (by *Janet M. Tooley*), for Michigan Trial Lawyers
Association.

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, and *Robert L. Willis, Jr.,*
Assistant Attorney General, for Michigan Department
of Civil Rights.

Before: GAGE, P.J., and KELLY, HOOD, MCDONALD,
CAVANAGH, SAAD, and O'CONNELL, JJ.

SAAD, J.

### I. NATURE OF THE CASE

This conflicts panel was convened to decide if a
predispute[1] agreement to arbitrate statutory employ-
ment discrimination claims arising under the Michi-
gan Civil Rights Act[2] (CRA) and the Persons With Disa-
bilities Civil Rights Act[3] (PWDCRA) is valid and enforce-
able. In *Rushton v Meijer, Inc (On Remand),* 225

---

[1] We use the term "predispute" arbitration agreement to distinguish this
type from an arbitration agreement that the parties enter into after the
dispute arises.

[2] MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

[3] MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.*

Mich App 156; 570 NW2d 271 (1997), this Court held that this kind of predispute agreement is invalid as a matter of public policy. Contrary to *Rushton's* holding, the overwhelming majority of federal and other state courts have held that these agreements are enforceable, provided that the arbitration procedures are fair and the agreement waives no substantive rights and remedies. We join the majority of courts and hold that as long as no rights or remedies accorded by the statute are waived, and as long as the procedure is fair, employers may contract with their employees to arbitrate statutory civil rights claims.

Our holding breaks no new ground, but rather is consistent with our state's public policy, and federal public policy, both of which increasingly and overwhelmingly favor arbitration as an inexpensive and expeditious alternative to litigation. Specifically, our holding furthers the objectives of the Michigan arbitration act (MAA),[4] which is a strong and unequivocal legislative expression of Michigan's proarbitration public policy. In accordance with the MAA's endorsement of arbitration, and the CRA's and the PWDCRA's silence regarding the matter, we will not interfere with private parties' contractual undertakings to arbitrate these claims.[5]

Our opinion is also consistent with the traditional principles of freedom of contract in the employment

---

[4] MCL 600.5001 *et seq.*; MSA 27A.5001 *et seq.*

[5] In § III.B.2 of this opinion, *infra* at 158-159 we discuss how neither the CRA nor the PWDCRA prohibit predispute agreements to arbitrate claims arising under these statutes.

context.[6] Clearly, employers are free to condition employment on employer-drafted wage and benefit structures and work rules as long as they comply with applicable statutory and common-law mandates. Similarly, we hold that employers are also free to require arbitration of claims as a condition of employment, provided that the agreement complies with our holding here.

While our decision upholds the principle of freedom of contract and advances the public policy that strongly favors arbitration, it does so subject to two conditions generally accepted in the common law: that the agreement waives no substantive rights, and that the agreement affords fair procedures. These conditions are rooted in two critically important bases: (1) our Supreme Court's decision in *Renny v Port Huron Hosp*, 427 Mich 415; 398 NW2d 327 (1986), which held that agreements to arbitrate employment claims must have fair procedures, and (2) Michigan and federal decisions (which generally have been held to be persuasive authority in Michigan employment discrimination cases) that uniformly hold that these arbitration agreements may not waive any substantive rights or remedies provided by the statute and must provide for fair procedures. With regard to procedural fairness, we will also detail below the specific procedural safeguards that we believe are mandated by *Renny*'s requirement of fair procedures.

---

[6] For example, in *Sands Appliance Services v Wilson*, 231 Mich App 405, 419; 587 NW2d 814 (1998), this Court recognized the "parties' rights to make and enforce contracts specific to their needs and circumstances," specifically a contract in which the employee agreed to reimburse his employer for job training.

Additionally, as we discuss below, contracts providing for compulsory arbitration of discrimination claims must, of course, meet the general rules regarding the validity of contracts. Although other contractual issues raised in this case are beyond the scope of this conflicts panel, we do hold, as a matter of law, that an arbitration agreement that does not diminish the rights and remedies guaranteed by the relevant employment discrimination statute and that is fair procedurally is not an unenforceable contract of adhesion.

After discussing the facts, we will analyze the issues in the following sequence. We begin by discussing the prevailing public policy favoring arbitration that is evidenced in both Michigan and federal law. We then address how this proarbitration policy developed to include claims arising under public interest statutes and trace that development to judicial approval of predispute agreements to arbitrate statutory civil rights claims. Thereafter, we examine the necessary conditions for enforcement of these agreements: (1) a valid arbitration contract, (2) the absence of statutory prohibition against arbitrating particular statutory claims, and (3) the requirements of procedural fairness. Finally, we set forth the specific requirements for procedural fairness and define the standard of review.

## II. FACTS AND PROCEEDINGS

Defendant Ryan's Family Steak Houses, Inc., hired plaintiff as a bread maker in October 1993. At the time he was hired, plaintiff signed an arbitration agreement with Employment Dispute Services, Inc.

(EDS). The arbitration agreement provided, in pertinent part:

> Your potential Employer ("signatory company" or "Company") has entered into an agreement with Employment Dispute Services, Inc. (EDS) to arbitrate and resolve any and all employment-related disputes between the Company's employees (and job applicants) and the Company. The following Agreement between You and EDS is a "selection of forum" agreement by which you agree that employment-related disputes between You and the Company shall be resolved through arbitration. Any arbitration matter shall be heard and decided under the provisions and the authority of the Federal Arbitration Act, 9 USC sec. 1, as applicable.
>
> The purpose of this agreement is to provide You and the Company a forum in which claims or disputes with the Company and any other signatories may be resolved by arbitration rather than litigation. This Agreement does not restrict you from filing a claim or charge with any state or federal agency, for example, Equal Employment Opportunity Commission, state unemployment agency, state workers' compensation commission, where applicable. Rather, the Agreement applies only to State or Federal court proceedings.

While an employee with Ryan's Family Steak Houses, Inc., plaintiff sued defendants in the circuit court for race discrimination under the CRA and handicap discrimination under the PWDCRA (then known as the Michigan Handicappers' Civil Rights Act). Plaintiff alleged that he suffers from epilepsy and cognitive defects resulting from a head injury. Plaintiff made a variety of allegations relating to discrimination in the terms of his employment. Plaintiff subsequently resigned his employment and amended his complaint to include a charge of constructive discharge. Plaintiff also raised a common-law claim of intentional infliction of emotional distress.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(7) (agreement to arbitrate) based on the signed arbitration agreement. After ruling that plaintiff had failed to establish that he was incompetent to understand the agreement he had signed, the trial court granted defendants' motion.[7] Plaintiff appealed. Meanwhile, a majority of a panel of this Court decided in *Rushton, supra,* that agreements to arbitrate employment-related discrimination claims were unenforceable as a matter of public policy. A panel of this Court therefore reversed the trial court's order in this case because it was obligated to follow *Rushton* under MCR 7.215(H)(1). *Rembert v Ryan's Family Steakhouse, Inc,* 226 Mich App 821; 575 NW2d 287 (1997) (*Rembert I*). The *Rembert I* panel opined that it reversed the trial court's order only because it was obligated to follow *Rushton* and that it would have held otherwise if free to do so. The Court thereby invoked the conflicts panel provision under MCR 7.215(H). Pursuant to MCR 7.215(H), *Rembert I* was vacated, 226 Mich App 821-822, and this special conflicts panel was convened to resolve the conflict.

### III. ANALYSIS

#### A. MICHIGAN AND FEDERAL LAW ENDORSE ARBITRATION

##### 1. MICHIGAN COMMON LAW AND STATUTORY LAW STRONGLY FAVOR ARBITRATION

Our Legislature has expressed a strong public policy favoring private voluntary arbitration, and our

---

[7] On appeal, plaintiff raised issues relating to his allegation of incompetence. We do not address these issues, because they are beyond the scope of this special conflicts panel.

courts have historically enforced agreements to arbitrate disputes. As early as the nineteenth century, our Supreme Court held: "A parol submission to arbitration is good at common law, and is not forbidden by any statute. . . . If [the parties submitted their agreement to a common arbiter], it would be a valid award." *Cady v Walker*, 62 Mich 157, 159; 28 NW 805 (1886). See also *Hoste v Dalton*, 137 Mich 522, 526; 100 NW 750 (1904) (rejecting various arguments against enforcement of arbitration), and *Detroit v A W Kutsche & Co*, 309 Mich 700, 703; 16 NW2d 128 (1944) ("The general policy of this State is favorable to arbitration. . . . If parties desire arbitration, courts should encourage them.").

Judicial approval of arbitration has broadened and strengthened in recent decades. This Court stated in *E E Tripp Excavating Contractor, Inc v Jackson Co*, 60 Mich App 221, 246-247; 230 NW2d 556 (1975):

> The heavily case-loaded courts are no longer jealous of their jurisdiction. Where the parties, *by a fair agreement*, have adopted a speedy and inexpensive means by which to have their disagreements adjusted, we see no public policy reasons for the courts to stand in their way. *On the contrary we have a clear expression of public policy in the legislative enactments which provide for statutory arbitration.* [Emphasis supplied.]

Judicial approbation of arbitration has grown and now applies to many fields. For example, in the important area of medical malpractice, our Court, in *Cox v D'Addario*, 225 Mich App 113, 129-130; 570 NW2d 284 (1997), upheld an arbitration agreement as valid under Michigan's medical malpractice act because "the public policy of this state favors the enforcement of valid arbitration agreements." Further,

in *Moss v Dep't of Mental Health*, 159 Mich App 257, 264; 406 NW2d 203 (1987), involving statutory and contract rights of mental health provider employees, our Court held that arbitration was not an "unconstitutional intrusion upon the powers of the judiciary," but rather is a "well-established mechanism for dispute resolution which is highly favored by the courts." In *F J Siller & Co v City of Hart*, 400 Mich 578, 581-582; 255 NW2d 347 (1977), our Supreme Court declined to interpret an agreement to arbitrate a construction contract dispute as meaning that arbitration was merely a "condition precedent" to litigation. In so holding, the Court made the broad statement that "the parties' intent regarding the finality of arbitration should be ascertained by the usual rules of interpretation and given effect." *Id.* at 581. In *Chippewa Valley Schools v Hill*, 62 Mich App 116, 120; 233 NW2d 208 (1975), involving a public employee's right to pregnancy leave, the Court declared: "Doubts should be resolved in favor of arbitration. The burden is on the party seeking to show nonarbitrability." Indeed, this Court has upheld arbitration even in the highly sensitive area of child custody disputes. In *Dick v Dick*, 210 Mich App 576, 588; 534 NW2d 185 (1995), the Court found "no clear prohibition in case law, court rule, or statute against the use of binding arbitration in the resolution of custody disputes" and held that "[b]inding arbitration is an acceptable and appropriate method of dispute resolution in cases where the parties agree to it."

Following federal precedent (discussed in detail *infra*), Michigan law has upheld predispute agreements to arbitrate statutory claims, *Scanlon v P & J Enterprises, Inc*, 182 Mich App 347; 451 NW2d 616

(1990), provided, of course, that the "agreement to arbitrate does not diminish the impact of the law," *Mid East Transcontinental, Inc v Onion Crock, Inc*, 114 Mich App 57, 59; 318 NW2d 604 (1982).

Further, and most importantly for our analysis, the appellate courts of this state have upheld arbitration agreements in the employment context. *Moss, supra; Chippewa Valley Schools, supra.* Our Supreme Court recently held that employers who establish individual just-cause employment contracts with their employees can require arbitration of employment claims arising out of the employment contract. *Renny, supra.* Since *Renny*, this Court has routinely held that just-cause employers can require employees to challenge breaches of just-cause employment through arbitration or other grievance procedures. *Carlson v Hutzel Corp of Michigan*, 183 Mich App 508, 513; 455 NW2d 335 (1990); *Dahlman v Oakland Univ*, 172 Mich App 502; 432 NW2d 304 (1988). Clearly then, Michigan jurisprudence favors arbitration, and the employment context is no exception. To be sure, the courts of this state, as well as other courts, have cautioned that certain safeguards are necessary, particularly in connection with arbitration of statutory (as opposed to private) claims, but we will address this aspect in due course.

Before analyzing our Legislature's strong endorsement of arbitration, we will answer plaintiff's contention that *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405; 550 NW2d 243 (1996), stands as a repudiation of our state's public policy favoring arbitration. A unanimous Supreme Court held in *Heurtebise* that the employee handbook, which purportedly established compulsory arbitration, was not,

in fact, a binding contract for reasons unrelated to arbitration. *Id.* at 414, 438. Therefore, the remaining question—whether the handbook would have violated public policy if, in fact, it had been a binding contract—was moot. Nonetheless, a minority of the Court expressed the opinion that the CRA voided the arbitration agreement (contained in the handbook) as a matter of public policy. *Id.* at 436. However, statements in a *minority opinion* are obviously insufficient to undermine our state's historical public policy favoring arbitration. Furthermore, the *Heurtebise* minority apparently did not consider, as we do here, whether arbitration agreements would be acceptable if written to preserve all substantive rights and remedies under the civil rights statutes and to comport with the "fair procedure" requirement of *Renny, supra.* We therefore find nothing in Michigan's case law that dissuades us from approving arbitration agreements in the employment discrimination context. On the contrary, the consistent and strong common-law endorsement of arbitration reinforces our conclusion that these agreements are valid and consistent with Michigan public policy.

Michigan statutory law further reinforces this conclusion. Unquestionably, public policy pronouncements of the Michigan Legislature, enacted as statutes, are binding on this Court. *Int'l Recovery Systems, Inc v Gabler*, 208 Mich App 49, 53; 527 NW2d 20 (1994), citing *Lieberthal v Glens Falls Indemnity Co*, 316 Mich 37, 40; 24 NW2d 547 (1946). Our Legislature significantly advanced the public policy favoring arbitration in 1961 when it enacted the Michigan arbitration act, (MAA), MCL 600.5001 *et seq.*; MSA 27A.5001 *et seq.* This statute, patterned on the Uniform Arbitra-

tion Act, is a strong and unequivocal endorsement of binding arbitration agreements:

(1) *All persons*, except infants and persons of unsound mind, may, by an instrument in writing, submit to the decision of 1 or more arbitrators, *any controversy* existing between them, which might be the subject of a civil action, *except as herein otherwise provided*, and may, in such submission, agree that a judgment of any circuit court shall be rendered upon the award made pursuant to such submission.

(2) A provision in a written contract to settle by arbitration under this chapter, a controversy thereafter arising between the parties to the contract, with relation thereto, and in which it is agreed that a judgment of any circuit court may be rendered upon the award made pursuant to such agreement, shall be *valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract*. Such an agreement shall stand as a submission to arbitration *of any controversy arising under said contract* not expressly exempt from arbitration by the terms of the contract. Any arbitration had in pursuance of such agreement shall proceed and the award reached thereby shall be enforced under this chapter.

(3) The provisions of this chapter shall not apply to *collective contracts between employers and employees* or *associations of employees* in respect to terms or conditions of employment. [MCL 600.5001; MSA 27A.5001 (emphasis supplied).]

"The MAA evidences Michigan's strong public policy favoring arbitration." *Grazia v Sanchez*, 199 Mich App 582, 584; 502 NW2d 751 (1993), citing *Marciniak v Amid*, 162 Mich App 71, 76; 412 NW2d 248 (1987). For example, Judge, now Justice, TAYLOR correctly observed in his dissent in *Rushton*:

This act allows predispute contracts to arbitrate and only excepts collective bargaining and certain real estate disputes from its purview. . . . Because the act allows predispute agreements to arbitrate civil rights claims, it establishes Michigan's public policy concerning this issue. Obviously, if the Legislature wanted to preclude predispute agreements to arbitrate civil rights claims, it would have excluded such claims by name, just as it excluded collective bargaining agreements and certain real estate claims. The express exclusion of some claims implies inclusion of those not mentioned. . . . Therefore, for this reason also, there is no justification for this Court to substitute its judgment for that of the contracting parties in declaring the parties' predispute agreement to arbitrate invalid. [*Rushton*, *supra* at 174-175.]

As the foregoing review of Michigan law makes clear, our Legislature and our courts have strongly endorsed arbitration as an inexpensive and expeditious alternative to litigation. Accordingly, the question that naturally calls for close examination is whether, under Michigan law, this overwhelming authority favoring arbitration should apply with equal force to statutory employment discrimination claims. In analyzing this question, we will review the historical development of statutory claims first under federal law and then under Michigan law.

### 2. FEDERAL LAW STRONGLY FAVORS ARBITRATION

The Federal Arbitration Act (FAA), 9 USC 1 *et seq.*, provides, in pertinent part:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle

by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. [9 USC 2.]

Obviously, this statute expresses a strong federal policy in favor of arbitration.[8] As the following discussion will reveal, cases interpreting the FAA have continued to strengthen this proarbitration policy, both for statutory claims in general and statutory employment discrimination claims in particular.[9]

---

[8] Defendants suggest that we resolve this issue by holding that the arbitration contract is enforceable under the FAA and that the FAA preempts state law prohibiting arbitration. The United States Supreme Court held in *Southland Corp v Keating*, 465 US 1; 104 S Ct 852; 79 L Ed 2d 1 (1984), that the FAA preempts state law and that state courts cannot apply state statutes that invalidate arbitration agreements. We see no need to resolve this question on the basis of FAA preemption. We find nothing in the MAA, the CRA, the PWDCRA, or any other Michigan authority that voids the arbitration agreement; hence there is nothing contrary for the FAA to preempt.

[9] National public policy has strongly evinced a longstanding endorsement of arbitration in the employment context. The *Steelworkers* trilogy established arbitration as the key means to resolving collective bargaining agreements. *United Steelworkers of America v Enterprise Wheel & Car Corp*, 363 US 593; 80 S Ct 1358; 4 L Ed 2d 1424 (1960); *United Steelworkers of America v Warrior & Gulf Navigation Co*, 363 US 574; 80 S Ct 1347; 4 L Ed 2d 1409 (1960); *United Steelworkers of America v American Mfg Co*, 363 US 564; 80 S Ct 1343; 4 L Ed 2d 1403 (1960). This trilogy of cases recognized that labor arbitrators are uniquely positioned and qualified to resolve disputes according to the parties' particular needs (especially the need to continue a productive working relationship) and that arbitration is ideally suited to resolving disputes that arise from workers' collective labor contracts. Because arbitration of individual civil rights claims may involve different arbitral skills and analytical framework from those in the collective bargaining context, we do not cite the *Steelworkers* trilogy as a model for arbitrating CRA and PWDCRA claims. However, we do note that arbitration in the area of traditional labor law has been a singular success.

3. ARBITRATION OF STATUTORY CLAIMS AND THE *MITSUBISHI*
TRILOGY

a. FEDERAL RECOGNITION OF ARBITRABILITY OF STATUTORY
CLAIMS

Opponents of arbitration in this case, as elsewhere, generally acknowledge the public policy favoring arbitration, but claim that it ought not apply to claims arising under public interest statutes such as civil rights statutes. They argue that the public policy advanced by the statutes would be undermined if these disputes were addressed in the relatively private forum of arbitration. These very arguments were thoroughly considered and rejected by the United States Supreme Court in a trio of cases known as the *Mitsubishi* trilogy[10] and, later, in *Gilmer v Interstate/Johnson Lane Corp*, 500 US 20; 111 S Ct 1647; 114 L Ed 2d 26 (1991). Although initially reluctant to endorse predispute arbitration agreements of statutory claims, federal law has long since strongly endorsed arbitration of statutory claims.

*Wilko v Swan*, 346 US 427; 74 S Ct 182; 98 L Ed 168 (1953), is representative of the initial skepticism toward arbitration. There, the United States Supreme Court held that predispute agreements to arbitrate claims arising under the Securities Act of 1933[11] were void under § 14 of the Securities Act, which nullified stipulations to waive compliance with the Securities Act. Like the opponents of arbitration here, the Court

---

[10] *Mitsubishi Motors Corp v Soler Chrysler-Plymouth, Inc*, 473 US 614; 105 S Ct 3346; 87 L Ed 2d 444 (1985), *Shearson/American Express, Inc v McMahon*, 482 US 220; 107 S Ct 2332; 96 L Ed 2d 185 (1987), and *Rodriguez de Quijas v Shearson/American Express, Inc*, 490 US 477; 109 S Ct 1917; 104 L Ed 2d 526 (1989).

[11] 15 USC 77a *et seq*.

in *Wilko* equated a waiver of a judicial forum with a waiver of compliance with the substantive provisions of the statute.

*Wilko* has since been overruled, and its entire rationale has been thoroughly discredited and unequivocally rendered obsolete by the *Mitsubishi* trilogy. In this trilogy, the Supreme Court repudiated its former characterization of arbitration as a second-rate forum in which statutory rights are necessarily diminished. Instead, the Court recognized arbitration as an efficacious means for parties to enforce their statutory rights and held that parties who had agreed to arbitrate would be bound by those agreements. *Mitsubishi Motors Corp v Soler Chrysler-Plymouth, Inc*, 473 US 614; 105 S Ct 3346; 87 L Ed 2d 444 (1985), *Shearson/American Express, Inc v McMahon*, 482 US 220; 107 S Ct 2332; 96 L Ed 2d 185 (1987), and *Rodriguez de Quijas v Shearson/American Express, Inc*, 490 US 477; 109 S Ct 1917; 104 L Ed 2d 526 (1989). In *Mitsubishi, supra* at 626-627, the Court stated that "we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." Accordingly, the Court upheld the federal public policy favoring arbitration, applying it to statutory claims under statutes that prohibited any contractual waiver of the statutory rights. *Id.* The Court's holdings were largely based on the FAA, which, like the MAA, broadly sanctioned agreements to arbitrate without excepting statutory claims: "we find no warrant in the [Federal] Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims." *Id.* at 625. Citing the "liberal federal policy

favoring arbitration agreements," *id.*, the Court concluded that there was "no reason to depart from these guidelines where a party bound by an arbitration agreement raises claims founded on statutory rights." *Id.* at 626.

In addition to strongly endorsing arbitration of statutorily based claims, the Supreme Court also carefully considered and rejected the many arguments against arbitration raised by plaintiff and amici here. Most relevant for our purposes was the argument that the persons protected by these statutes would necessarily be harmed if required to pursue their rights in arbitration rather than in court. Just as plaintiff in the instant case argues that compulsory arbitration will inevitably compromise the objectives of the CRA and the PWDCRA, the plaintiffs in the *Mitsubishi* cases also argued that the objectives of the pertinent public interest statutes[12] would be seriously jeopardized if those claimants were held bound by predispute arbitration agreements. In each instance, after careful analysis, the Court concluded that arbitration need not undermine the public policy behind these statutes. In *Mitsubishi, supra* at 628, the Court stated that "concern for statutorily protected classes provides no reason to color the lens through which the arbitration clause is read." In *McMahon, supra* at 240-241, involving the Racketeer Influenced and Corrupt Organizations Act (RICO), the Court commented that the RICO's emphasis is on providing redress for victims

---

[12] The pertinent statutes were as follows: in *Mitsubishi*, the Sherman Antitrust Act, 15 USC 1 *et seq.*; in *McMahon*, the Securities Act of 1933, *supra*, and the Racketeer Influenced and Corrupt Organizations Act, 18 USC 1961 *et seq.*; in *Rodriguez*, the Securities Exchange Act of 1934, 15 USC 78j(b).

and that arbitration will competently serve that emphasis. And in *Rodriguez, supra* at 484, the Court stated that the "[arbitration] avenue of relief is in harmony with the Securities Act's concern to protect buyers of securities."

Most importantly for our purposes, the Court roundly dismissed the suggestion that a waiver of the judicial forum means a waiver of statutory rights: "By agreeing to arbitrate a statutory claim, a party *does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." Mitsubishi, supra* at 628 (emphasis supplied). In *McMahon, supra,* and *Rodriguez, supra,* the plaintiffs argued that the predispute arbitration agreements were void under the two securities statutes' provisions prohibiting stipulations to waive compliance with the statutes.[13] The Court rejected this argument because the arbitration agreement did not, in fact, waive compliance with either statute. *McMahon, supra* at 234; *Rodriguez, supra* at 480. As for public policy and the RICO, the Court in *McMahon, supra* at 238, stated that "there is nothing in the text of the RICO statute that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the [Federal] Arbitration Act." The Court would infer neither an antiarbitration injunction from the securities statutes' prohibition of stipulations to waive compliance nor an antiarbitration prohibition from the RICO.

Also, like plaintiff and amici here, plaintiffs in the *Mitsubishi* cases argued that while arbitration of statutory claims would serve the compensatory goals of

---

[13] 15 USC 77n;  15 USC 78cc(a).

the statutes, arbitration would undermine their deterrent purpose. In response, the Court in *Mitsubishi, supra* at 637, reasoned that "so long as the prospective litigant may effectively vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." The Court in *McMahon, supra* at 240-241, held that these principles applied to the RICO as well.[14]

The Court also rejected the rather questionable argument that arbitrators are insufficiently equipped to handle legally complex antitrust claims. *Mitsubishi, supra* at 633-634. Also, the Court held (as we do) that judicial review of arbitration awards, albeit limited, was nonetheless sufficient to ensure compliance with the statutory requirements. *Id.* at 636-637.[15]

In each case in the *Mitsubishi* trilogy, the Supreme Court concluded that the broad provisions of the FAA, coupled with the public policy favoring arbitration, mandated enforcement of the arbitration agreements. Accordingly, the Court held that if the parties had agreed to arbitrate statutory claims, the agreement should be enforced unless the relevant statute prohibited arbitration or the agreement foreclosed effective vindication of statutory rights. *Id.* at 628.

---

[14] In addition to the concerns discussed in this opinion, the *Mitsubishi* cases involved concerns that are not relevant to the instant case. In *Mitsubishi*, the Sherman Act claim was to be submitted to an international arbitration panel, hence, the Court had to consider whether the integrity of American law could be upheld in an international forum. In *McMahon* and *Rodriguez*, the Court considered whether arbitration would undermine the criminal enforcement provisions of the RICO and the securities statutes. The Court's decision to uphold arbitration even over these considerations underscores the favored position of arbitration.

[15] Judicial review of civil rights arbitration will be discussed in greater detail, *infra* at 163-166.

b. MICHIGAN APPLICATION OF THE *MITSUBISHI* TRILOGY

This Court adopted the *Mitsubishi* rationale in *Scanlon, supra,* 182 Mich App 350. At issue in *Scanlon* was whether a franchisee, who had executed a predispute arbitration agreement with the franchisor, would be required to arbitrate a claim arising under the Michigan Franchise Investment Law.[16] Citing the *Mitsubishi* trilogy, the Court held that "[a]ny claim the parties have agreed to arbitrate, *including a statutory claim,* is a proper subject of arbitration under substantive federal law unless Congress has specifically excepted the issue from arbitration." *Id.* (emphasis supplied).

Three years *before* the Supreme Court decided *Mitsubishi,* this Court had already rejected the rationale of *Wilko* and enforced a predispute agreement to arbitrate a statutory claim arising under the Franchise Investment Law. In *Mid East Transcontinental, supra,* 114 Mich App 59, the Court held:

> We do not find the rationale employed by the Court in *Wilko* to be applicable under the Franchise Investment Law. By agreeing to arbitrate, the franchise holder does not surrender any advantage derived exclusively from the Franchise Investment Law. *Where an agreement to arbitrate does not diminish the impact of the law, we see no reason to limit the declared policy favoring the resolution of disputes by arbitration.* [Emphasis supplied.]

Our Court thus anticipated the holding in *Mitsubishi* by upholding an agreement to arbitrate statutory claims *provided that the arbitration caused no detri-*

---

[16] MCL 445.1501 *et seq.;* MSA 19.854(1) *et seq.*

*ment to substantive rights.* Michigan law is therefore entirely consistent with *Mitsubishi*.

In sum, the basic rationale expressed by the Court in *Mitsubishi* for favoring arbitration, like the rationale expressed in our opinions, is twofold. First the Court endorsed the principle that an agreement to arbitrate a statutory claim does not constitute waiver of substantive rights.[17] *Mitsubishi, supra* at 628. Second, the Court recognized that a statute will serve both its remedial and deterrent functions as long as the prospective litigant can vindicate his statutory cause of action in the arbitral forum. *Id.* at 637.

With these general principles established regarding arbitration of statutory claims, we proceed to the question of how the United States Supreme Court applied its rulings in the *Mitsubishi* trilogy to predispute agreements to arbitrate the type of claim we deal with here—statutory employment discrimination claims.

### 4. PUBLIC POLICY FAVORING ARBITRATION OF STATUTORY CIVIL RIGHTS CLAIMS

#### a. *GILMER V INTERSTATE/JOHNSON LANE CORP*

Relying on *Alexander v Gardner-Denver Co*, 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974), plaintiff and amici argue that the strong national and state

---

[17] The *Gilmer* Court's position that arbitration need not curtail a claimant's substantive rights represents a complete reversal of the Court's statement in *Alexander v Gardner-Denver Co*, 415 US 36, 56; 94 S Ct 1011; 39 L Ed 2d 147 (1974), that "we have long recognized that 'the choice of forums inevitably affects the scope of the substantive right to be vindicated,'" quoting *United States Bulk Carriers, Inc v Arguelles*, 400 US 351, 359-360; 91 S Ct 409; 27 L Ed 2d 456 (1971). For those who believe juries are the key to huge awards, for better or worse, the statement quoting from *Arguelles* remains at the heart of the debate!

proarbitration policy should not extend to statutory employment discrimination claims. In *Gardner-Denver*—a case decided eleven years before *Mitsubishi*—the Supreme Court held that a unionized employee's earlier exercise of the compulsory arbitration provision in a *collective bargaining agreement* did not preclude him from later pursuing his title VII discrimination claim in a judicial forum. There, the Court expressed its concern that in the collective bargaining context, the employee asserting the discrimination claim might be harmed by waiving the litigation forum.[18]

The critical distinction between the instant case and *Gardner-Denver* is that the arbitration agreement in *Gardner-Denver* arose out of a collective bargaining agreement, rather than an individual employment contract. This distinction became salient in *Gilmer v Interstate/Johnson Lane Corp, supra,* where the Supreme Court significantly narrowed the scope of

---

[18] Similarly, in *Betty v Brooks & Perkins,* 446 Mich 270; 521 NW2d 518 (1994), our Supreme Court held that statutory civil rights, even when incorporated into a collective bargaining agreement, are not subject to preemption under § 301 of the Labor Management Relations Act, 29 USC 185(a) (which preempts state court jurisdiction over actions for breach of collective bargaining agreements).

The restriction on compulsory arbitration of statutory claims in the collective bargaining context is not absolute. In *Moss v Dep't of Mental Health,* 159 Mich App 257; 406 NW2d 203 (1987), this Court held that an arbitrator's resolution of a grievant's claim under the assault pay provision of the Mental Health Code, MCL 330.1113; MSA 14.800(113), barred further judicial action on the claim. The Court interpreted an earlier case, *Saginaw v Michigan Law Enforcement Union, Teamsters Local 129,* 136 Mich App 542; 358 NW2d 356 (1984) (which primarily involved judicial review of an arbitration award), as "rejecting the idea that *Gardner-Denver* allows for the survival of any statutory cause of action following an arbitration determination." *Moss, supra* at 262. Although these cases are not strictly relevant to the instant case, they are nonetheless indicative of how Michigan's proarbitration policy can even extend to certain statutory claims in collective bargaining arbitration.

*Gardner-Denver.* In *Gilmer, supra,* 500 US 26, the Court reinforced the presumption in favor of arbitration and reiterated its "healthy regard for the federal policy favoring arbitration" where, as here, the case involved private arbitration of an individual federal employment discrimination claim.

In *Gilmer,* the Court approved a compulsory arbitration agreement as applied to the plaintiff's federal Age Discrimination in Employment Act (ADEA)[19] claim. At issue was whether the plaintiff would be held bound by the agreement to arbitrate his ADEA claim. The Court held that the factors in *Gardner-Denver* that militated against collective bargaining arbitration of civil rights claims were not applicable in the individual employment contract context:

> There are several important distinctions between the *Gardner-Denver* line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the *quite different issue of whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions.* [*Gilmer, supra* at 35 (emphasis supplied).]

The *Gilmer* Court also noted that the *Gardner-Denver* Court was concerned that collective bargaining arbitration of civil rights claims might be hampered by competing interests:

---

[19]  29 USC 621 *et seq.*

> Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. *An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable in the present case.* [*Id.* (emphasis supplied).]

Lastly, the *Gilmer* Court noted that *Gardner-Denver* and other collective bargaining cases "were not decided under the FAA, which . . . reflects a 'liberal federal policy favoring arbitration agreements.'" *Id.,* quoting *Mitsubishi, supra* at 625.

As it did in the *Mitsubishi* trilogy, the *Gilmer* Court squarely addressed the objections that the plaintiff raised to the validity of predispute agreements to arbitrate statutory employment discrimination claims. Like plaintiff here, the plaintiff in *Gilmer* questioned whether an employment discrimination plaintiff could obtain a full and fair adjudication of his claim in arbitration. The *Gilmer* Court's answer is highly pertinent here, where plaintiff and amici raise many of the same concerns.

First, like plaintiff here, the *Gilmer* plaintiff argued that the social policies advanced by the civil rights statute would inevitably be thwarted if wronged employees were required to arbitrate their claims. The Court found no "inherent inconsistency" between the ADEA policies and arbitration. *Gilmer, supra* at 27. The Court agreed with the plaintiff's contention that arbitration focuses on "specific disputes between the parties" rather than on broad social issues, but also noted that this is true in litigation. *Id.* at 27-28. The Court concluded that this limitation does not prevent either arbitration or litigation from furthering

"broader social purposes." *Id.* at 28, quoting *Mitsubishi, supra* at 637. We agree with this conclusion.

Second, the *Gilmer* Court found no inconsistency between arbitration and the administrative role of the Equal Employment Opportunity Commission (EEOC), because the employee bound by an arbitration agreement is still free, as plaintiff is here, to file administrative charges—there with the EEOC, here with the Michigan Department of Civil Rights (MDCR).[20] *Gilmer, supra* at 28.

Third, the *Gilmer* Court also rejected the argument that compulsory arbitration wrongly deprived claimants of the judicial forum Congress provided by enacting the ADEA. The Court concluded that Congress could have precluded compulsory arbitration when it passed the ADEA, but did not. *Id.* at 29. Similarly, neither the language of the CRA and the PWDCRA nor their legislative history exhibits any bar to agreements to arbitrate CRA and PWDCRA claims. We discuss this further in § III.B.2., *infra* at 158-159.

The plaintiff in *Gilmer* also raised a "host of challenges" regarding "the adequacy of arbitration procedures" to adjudicate statutory claims. Importantly, the Court responded:

> Such generalized attacks on arbitration "res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complain-

---

[20] The arbitration agreement in this case does not restrict the employee's right to seek administrative relief through the MDCR or the EEOC. We agree with *Gilmer*, however, that arbitration agreements are not valid if they restrict MDCR enforcement of the CRA. We disagree with the decision in *Equal Employment Opportunity Comm v Frank's Nursery & Crafts, Inc*, 966 F Supp 500 (ED Mich, 1997), to the extent that it upholds provisions of an arbitration agreement that prevented a plaintiff from seeking relief through the EEOC or the MDCR.

ants," and as such, they are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." [*Gilmer, supra* at 30, quoting *Rodriguez, supra* at 481.]

The *Gilmer* Court proceeded to address the specific objections the parties raised to arbitration procedures. We will recount these issues in detail, because we believe they are instructive with respect to formulating arbitration agreements and procedures that are fair.

The plaintiff complained of potential arbitral bias against employees. *Gilmer, supra* at 30. The Court " 'decline[d] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators.' " *Id.*, quoting *Mitsubishi, supra* at 634. The Court analyzed this issue further, however, and was satisfied that the arbitration rules of the New York Stock Exchange (NYSE) and the FAA provided sufficient safeguards against potential bias. The rules of the NYSE included access to information concerning the arbitrators' backgrounds, one peremptory challenge per party, and unlimited challenges for cause. *Gilmer, supra* at 30. Also, as an ultimate safeguard, the FAA, like MCR 3.602(J)(1)(b), authorized courts to overturn arbitration decisions on evidence of partiality or corruption.[21] We would also note that aggrieved employees have the right to counsel, MCR 3.602(G), and, therefore, can rely on counsel to be vigilant in addressing any potential arbitral bias.

The plaintiff in *Gilmer* complained that he would be hindered by arbitration discovery, which was more

---

[21] 9 USC 10(b).

limited than discovery in federal courts. The Court
found, however, that the NYSE discovery provisions,
which allowed for "document production, information
requests, depositions and subpoenas," were sufficient
to prove a discrimination claim. *Gilmer, supra* at 31.
Relying on the *Mitsubishi* trilogy, the Court reasoned
that if arbitration discovery was sufficient for RICO
and antitrust claims, it must also be sufficient for dis-
crimination claims. Finally, the Court stated that "an
important counterweight to the reduced discovery in
NYSE arbitration is that arbitrators are not bound by
the rules of evidence." *Id.*

The *Gilmer* plaintiff further argued that arbitration
was inadequate because arbitrators are not required
to issue written opinions. The Court dismissed this
argument because the NYSE rules required "that all
arbitration awards be in writing, and that the awards
contain the names of the parties, a summary of the
issues in controversy, and a description of the award
issued." *Id.* at 31-32. The Court stated that the written
opinions would serve to alert the public of discrimi-
nation disputes and their outcomes, allow for effec-
tive appellate review of arbitral decisions, and
advance development of the law. *Id.*

Finally, the plaintiff in *Gilmer* argued that arbitra-
tion procedures were inadequate to enforce the ADEA
because they did not permit equitable relief. The
Court dismissed this argument because the NYSE rules
did not, in fact, restrict the arbitrator's power to fash-
ion equitable relief.

In summary, the *Gilmer* Court extended the *Mit-
subishi* line of authority to predispute agreements to
arbitrate statutory employment discrimination claims.
Consistent with *Mitsubishi*, the *Gilmer* Court further

reinforced the public policy favoring arbitration and found no reason why it could not be reconciled with the public policy of the civil rights statutes. It imposed on the party seeking to avoid arbitration the burden of rebutting the presumption that arbitration agreements are enforceable. It declined to find an implicit disapproval of arbitration agreements in the civil rights statutes, and it upheld the arbitration agreement in the absence of any clear statutory prohibition. However, rather than granting carte blanche approval of any predispute employment arbitration agreement, it gave careful consideration to the plaintiff's contentions of what he saw as weaknesses in the arbitration process. The *Gilmer* Court upheld the agreement because it determined that the plaintiff waived no rights and that the arbitral procedures were fair.

### b. *GILMER* PROGENY

Since the Court's landmark decision in *Gilmer*, the vast majority of federal and state courts that have addressed this issue have followed *Gilmer* and held that statutory employment discrimination claims are subject to predispute compulsory arbitration by way of employment contracts.[22] Collectively, these deci-

---

[22] This is true not only for the securities registration agreements addressed in *Gilmer*, but also for other categories of employment-related contracts. We comment on this distinction only because the Court of Appeals for the Fifth Circuit opined, in *Alford v Dean Witter Reynolds, Inc*, 939 F2d 229, 230, n * (CA 5, 1991), that the FAA's exclusion for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" (9 USC 1) might preclude compulsory arbitration when the agreement is made between the employer and employee, as opposed to the *Gilmer* situation where the agreement was included in the employees' contract with a securities exchange. However, in *Rojas v TK Communications, Inc*, 87 F3d 745,

sions have held that *Gilmer* applies not only to the
ADEA, but also to title VII, state employment discrimi-
nation statutes, and other federal employment stat-
utes. We note that at least nine federal Circuit Courts
of Appeal have so ruled: *McWilliams v Logicon, Inc*,
143 F3d 573, 576 (CA 10, 1998)    (plaintiffs claims
under Americans with Disabilities Act[23] are arbitrable
because ADA does not prohibit arbitration, but actually
encourages it); *Cole v Burns Int'l Security Services*,
323 US App DC 133; 105 F3d 1465 (1997)    (discussed,
*infra* at 153-156); *O'Neil v Hilton Head Hosp*, 115 F3d
272 (CA 4, 1997)    (claim under Family and Medical
Leave Act, 29 USC 2601 *et seq.*, must go to arbitra-
tion); *Patterson v Tenet Healthcare, Inc*, 113 F3d 832
(CA 8, 1997)    (state and federal employment claims
subjected to compulsory arbitration agreement);

---

747-748 (CA 5, 1996), the Fifth Circuit Court of Appeals held that the FAA
exclusion was not applicable to an employment contract between a radio
disc jockey and her employer. The Fifth Circuit Court of Appeals' decision
in *Rojas* brought the Fifth Circuit in line with the majority of circuits that
have held that the FAA exclusion is to be narrowly construed as applying
only to those workers actually involved in the movement of goods in
interstate commerce. *McWilliams v Logicon, Inc*, 143 F3d 573, 575-576
(CA 10, 1998); *Cole v Burns Int'l Security Services*, 323 US App DC 133;
105 F3d 1465 (1997);   *Great Western Mortgage Corp v Peacock*, 110 F3d
222, 227 (CA 3, 1997);   *Asplundh Tree Expert Co v Bates*, 71 F3d 592, 596-
601 (CA 6, 1995); *Miller Brewing Co v Brewery Workers Local Union No
9, AFL-CIO*, 739 F2d 1159, 1162 (CA 7, 1984);   *Erving v Virginia Squires
Basketball Club*, 468 F2d 1064, 1069 (CA 2, 1972);   *Dickstein v duPont*,
443 F2d 783, 785 (CA 1, 1971). Indeed, one of the few decisions to the
contrary is a 1954 decision that expressly limited its holding to collective
bargaining agreements. *United Electrical Radio & Machine Workers of
America v Miller Metal Products, Inc*, 215 F2d 221, 224 (CA 4, 1954). The
Court of Appeals for the Ninth Circuit, however, has recently taken the
minority position that the FAA broadly excludes labor and employment
contracts from its coverage. *Craft v Campbell Soup Co*, 161 F3d 1199 (CA
9, 1998). This Court adopted the majority position in *DeCaminada v
Coopers & Lybrand, LLP*, 232 Mich App 492, 498-499; 591 NW2d 364
(1998). In any event, the MAA does not contain this exclusion.

[23] 42 USC 12101 *et seq.*

*Great Western Mortgage Corp v Peacock*, 110 F3d 222 (CA 3, 1997) (FAA required enforcement of agreement to waive state law right to judicial forum for state sexual harassment claims); *Rojas v TK Communications, Inc*, 87 F3d 745, 747-748 (CA 5, 1996) (enforceable arbitration agreement covered title VII claims); *Matthews v Rollins Hudig Hall Co*, 72 F3d 50, 54 (CA 7, 1995) (employee required to arbitrate ADEA claim); *Mago v Shearson Lehman Hutton Inc*, 956 F2d 932 (CA 9, 1992) ("privately negotiated" employment agreement required plaintiff to arbitrate her title VII sex discrimination and harassment claims) (but see *Duffield v Robertson Stephens & Co*, 144 F3d 1182 [CA 9, 1998], reaching a different result under the Civil Rights Act of 1991); *Alford v Dean Witter Reynolds, Inc*, 939 F2d 229, 230 (CA 5, 1991) (title VII claims can be subjected to compulsory arbitration agreement in securities registration); *Willis v Dean Witter Reynolds, Inc*, 948 F2d 305, 307 (CA 6, 1991) (under *Gilmer*, arbitration agreement in securities registration enforceable with respect to title VII claims).

Federal district courts in Michigan have also complied with this precedent and adopted *Gilmer's* reasoning. *Prudential Ins Co of America v Shammas*, 865 F Supp 429 (WD Mich, 1993) (arbitration agreement in securities registration required the plaintiff to arbitrate his CRA claims), and *Beauchamp v Great West Life Assurance Co*, 918 F Supp 1091 (ED Mich, 1996) (court enforced arbitration clause in securities registration form and compelled arbitration of age and sex discrimination claims).

Additionally, at least six states have followed *Gilmer*. See *Freeman v Minolta Business Systems, Inc*,

699 So 2d 1182 (La App, 1997) (under the FAA, court compelled the plaintiff to submit federal and state sexual harassment claims to arbitration); *Alamo Rent A Car, Inc v Galarza*, 306 NJ Super 384, 389; 703 A2d 961 (1997) (employer and employee can prospectively agree to arbitrate statutory claims under state civil rights statute); *Brown v KFC Nat'l Management Co*, 82 Hawaii 226; 921 P2d 146 (1996) (arbitration provision enforceable with regard to state civil rights claim); *Hill v Hilliard*, 945 SW2d 948 (Ky App, 1996) (sexual harassment and retaliation claims arose from employment and were subject to compulsory arbitration in employment contract, but related common-law tort claims did not arise from employment and could therefore be litigated); *Johnson v Piper Jaffray, Inc*, 530 NW2d 790 (Minn, 1995) (FAA preempts state civil rights statute to the extent that state law voids arbitration agreement); and *Fletcher v Kidder, Peabody & Co*, 81 NY2d 623; 619 NE2d 998 (1993), (*Gilmer* required the plaintiffs to arbitrate race and sex discrimination claims under state law in accordance with arbitration agreement in securities registration).[24] Only a minority of courts have resisted this

---

[24] As discussed above, *Gilmer* distinguished *Gardner-Denver* on the ground that the latter case involved a collective bargaining agreement rather than an individual contract. Since *Gilmer*, parties have raised the issue whether and to what extent *Gardner-Denver* remains viable authority. See *Pryner v Tractor Supply Co*, 109 F3d 354 (CA 7, 1997) for a thorough discussion of *Gilmer*'s potential effect on the viability of *Gardner-Denver*.

Some federal courts, including the United States District Court for the Eastern District of Michigan, have maintained that *Gardner-Denver* remains an effective bar to compulsory arbitration of civil rights claims in the collective bargaining context. *Jackson v Quanex Corp*, 889 F Supp 1007 (ED Mich, 1995); see also *Patton v Toshiba America Consumer Products, Inc*, 967 F Supp 283 (MD Tenn, 1997); *Krahel v Owens-Brockaway Glass Container, Inc*, 971 F Supp 440 (D Or, 1997). On the

trend toward upholding the validity of arbitration agreements.[25]

Of all these post-*Gilmer* decisions, we believe *Cole* to be the most instructive and the most significant because of its comprehensive analysis of the condi-

---

other hand, the Court of Appeals for the Fourth Circuit held in *Austin v Owens-Brockaway Glass Container, Inc*, 78 F3d 875 (CA 4, 1996) that the FAA requires enforcement of these agreements. The United States Supreme Court declined to resolve this controversy in *Wright v Universal Maritime Service Corp*, 525 US 70; 119 S Ct 391; 142 L Ed 2d 361 (1998). Our decision does not turn on the outcome of this controversy, and we express no opinion concerning the proper application of *Gilmer* to general arbitration clauses in collective bargaining agreements.

[25] For example, in *Duffield, supra*, 144 F3d 1189-1190, the Court of Appeals for the Ninth Circuit refused to enforce the arbitration agreement as it applied to the plaintiff's title VII claims. The court held that *Gilmer* was distinguishable because there, the plaintiff's lawsuit arose under the ADEA. The court then reasoned that *Gilmer* did not apply to title VII claims, because congressional intent precluded compulsory arbitration of title VII claims. The court inferred this "intent" from the legislative history of the Civil Rights Act of 1991. *Id.* at 1191. See also *Rosenberg v Merrill Lynch, Pierce, Fenner & Smith, Inc*, 995 F Supp 190, 200 (D Mass, 1998).

We are not persuaded by this reasoning. Instead, we agree with the reasoning in *Frank's Nursery, supra*, 966 F Supp 503, which concluded that "a prospective, voluntary agreement to proceed to arbitration" is not the sort of coercive action that the 1991 legislative history cautioned against. The legislative history cited by the *Duffield* court warned against arbitration agreements that precluded claimants from seeking relief under title VII's enforcement provision, and averred that alternate dispute resolution [ADR] should supplement, but not replace, judicial procedures. See *Duffield, supra* at 1195. The Court of Appeals for the First Circuit recently rejected the *Duffield* reasoning. *Rosenberg v Merrill, Lynch, Pierce, Fenner & Smith, Inc*, 170 F3d 1 (CA 1, 1999). Arbitration agreements that meet the *Gilmer* prerequisites of appropriate due process and that provide for full statutory rights and remedies do not implicate the concerns raised by the legislative history. Furthermore, we note that Congress has had seven years to act in response to the *Gilmer* decision. In any event, *Duffield* is obviously inapplicable here, where plaintiff has not raised any claims under title VII.

Various other cases have refused to enforce arbitration clauses on grounds of general contract principles, e.g., because the particular contract provision did not extend to the plaintiff's particular cause of action, or because the parties had not actually entered into a legally binding contract. These cases are consistent with *Gilmer*, and we do not regard them as "resisting this trend."

tions for an enforceable arbitration agreement.[26] *Cole* reviewed a trial court's decision to dismiss the plaintiff's title VII claims pursuant to the FAA and the arbitration agreement in the plaintiff's employment contract. In *Cole*, the Court of Appeals for the D.C. Circuit, like the *Gilmer* Court, addressed and thoughtfully rejected the major objections to arbitration as a method of adjudicating statutory employment discrimination claims. The *Cole* court also emphasized the features of the arbitration agreement in question, in order to address the plaintiff's contention that statutory rights would be compromised by arbitration.

After carefully reviewing the important objections to arbitration, *Cole, supra* at 144-146, Chief Judge Edwards concluded that "the Supreme Court now has made clear that, as a general rule, statutory claims are fully subject to binding arbitration . . . ." *Id.* at 146. The court then reviewed the arbitration agreement in question and reiterated the rationale of *Mitsubishi* and *Gilmer* in support of arbitration. Like *Gilmer*, Judge Edwards' opinion carefully and thoroughly rejects the charge that arbitration is inferior to litigation for the resolution of statutory employment discrimination claims.

Further, *Cole* squarely answered the plaintiff's contention that an agreement may be so procedurally unfair that it eviscerates the very rights guaranteed by the statute. The *Cole* court emphasized—correctly in our view—that *Gilmer* "cannot be read as holding

---

[26] We note that *Cole* was written by one of this country's leading and respected authorities on the subject of arbitration and employment discrimination, Chief Judge Harry T. Edwards of the United States Court of Appeals for the District of Columbia.

that an arbitration agreement is enforceable no matter what rights it waives or what burden it imposes." *Id.* at 150. The reason is clear: if the arbitration agreement is drafted in a way that effectively waives the plaintiff's substantive rights or remedies or so structures the procedures as to make it impossible for the plaintiff to "effectively vindicate his statutory cause of action," then the agreement would violate the rationale and mandates of *Mitsubishi, Gilmer,* and, we believe, *Renny. Cole, supra* at 150. Reviewing the agreement in question, the court held:

> We believe that all of the factors addressed in *Gilmer* are satisfied here. In particular, we note that the arbitration arrangement (1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs *or* any arbitrators' fees or expenses as a condition of access to the arbitration forum. Thus, an employee who is made to use arbitration as a condition of employment, "effectively may vindicate [his or her] statutory cause of action in the arbitral forum." [*Id.* at 150, quoting *Gilmer, supra,* 500 US 28.]

The *Cole* court not only answered effectively the objections to arbitration, it also emphasized the positive aspects of arbitration. In concluding that arbitration can effectively vindicate employees' statutory rights, the court in *Cole, supra* at 156, quoted from the report of the Dunlop Commission,[27] Commission on the Future of Worker-Management Relations,

---

[27] For additional information concerning the Department of Labor Commission on the Future of Worker-Management Relations (Dunlop Commission), see *Cole, supra* at 151, n 11. For the text of the report see http://www.irl.cornell.edu/library/e_archive/Dunlop.html.

Report and Recommendations, § 4, p 30, concerning the commission's assessment of the comparative advantages of arbitration over litigation:

> "[L]itigation has become a less-than-ideal method of resolving employees' public law claims. As spelled out in the Fact Finding Report, employees bringing public law claims in court must endure long waiting periods as governing agencies and the overburdened court system struggle to find time to properly investigate and hear the complaint. *Moreover, the average profile of employee litigants . . . indicates that lower-wage workers may not fare as well as higher-wage professionals in the litigation system; lower-wage workers are less able to afford the time required to pursue a court complaint, and are less likely to receive large monetary relief from juries.* Finally, the litigation model of dispute resolution seems to be dominated by "ex-employee" complainants, indicating that the litigation system is less useful to employees who need redress for legitimate complaints, but also wish to remain in their current jobs." [Emphasis supplied.]

The court also commented that arbitration "offers employees a guarantee that there will be a hearing on the merits of their claims," a guarantee not found in litigation, "where relatively few employees survive the procedural hurdles necessary to take a case to trial in the federal courts." *Cole, supra* at 156. The court concluded that "it is perhaps misguided to mourn the Supreme Court's endorsement of the arbitration of complex and important public law claims." *Id.*

Having found these advantages to arbitration, the *Cole* court called on arbitrators, as we do, to "step up to the challenges presented by the resolution of statutory issues" and "be vigilant to protect the important rights embodied in the laws entrusted to their care."

*Id.* It also exhorted arbitrators, as we do, to "actively ensure that the record is adequately developed and that procedural fairness is provided." *Id.* The *Cole* opinion ended with a warning, which we echo, that the courts will not permit arbitration to degenerate into inadequate justice:

> [A]ppointing agencies like AAA [American Arbitration Association] must be certain that only persons who are able to satisfy these criteria are added to arbitrator-panel lists. *For if arbitrators and agencies do not meet these obligations, the courts will have no choice but to intercede.* [*Id.* (emphasis supplied).]

In light of this history of Michigan and federal statutes and case law that strongly favors arbitration, we return to the three prerequisites to a valid agreement to arbitrate civil rights claims under Michigan law.

### B. CONDITIONS FOR ENFORCEABLE ARBITRATION AGREEMENT

We conclude, from the state and federal authorities reviewed thus far, that predispute agreements to arbitrate statutory employment discrimination claims are valid if: (1) the parties have agreed to arbitrate the claims (there must be a valid, binding, contract covering the civil rights claims), (2) the statute itself does not prohibit such agreements, and (3) the arbitration agreement does not waive the substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate his statutory rights.

1. REQUIREMENT OF VALID CONTRACT

Plaintiff and amici argue incorrectly that the contract in question is an unenforceable adhesion contract as a matter of law. Courts will not invalidate contracts as adhesion contracts where the challenged provision is reasonable. *Rehmann, Robson & Co v McMahan*, 187 Mich App 36, 43-44; 466 NW2d 325 (1991); *Ryoti v Paine, Webber, Jackson & Curtis, Inc*, 142 Mich App 805; 371 NW2d 454 (1985). Our decision requires arbitration agreements to be reasonable by holding that the agreement must not waive statutory rights and must be procedurally fair. Therefore, if the arbitration agreement here satisfies these conditions, it is reasonable as a matter of law and, therefore, not an unenforceable adhesion contract. Accordingly, we remand to the circuit court for findings concerning the validity of the contract consistent with our opinion.[28]

---

[28] Furthermore, a contract is an adhesion contract only if the party agrees to the contract because he has no meaningful choice to obtain the desired goods or services elsewhere. *Morris v Metriyakool*, 418 Mich 423, 440; 344 NW2d 736 (1984). If the prospective employee (applicant) would be able to obtain work elsewhere, the contract is not one of adhesion because the applicant has a meaningful choice in accepting the offer of employment. *Beauchamp, supra*, 918 F Supp 1098. Therefore, a predispute agreement to arbitrate statutory employment discrimination claims is not a contract of adhesion if either (a) the terms of the contract are reasonable or (b) the employee had a meaningful choice.

As a practical matter, the enforceability of a predispute agreement to arbitrate statutory civil rights questions will turn on whether the contract preserves substantive rights and remedies and is procedurally fair. If it satisfies these conditions, then it is reasonable, and it will be enforceable even if the employee did not have meaningful choice in signing it. *Rehmann, Robson & Co v McMahan*, 187 Mich App 36, 43-44; 466 NW2d 325 (1991); *Ryoti, supra*, 142 Mich App 805. If it does not satisfy these conditions, but the employee had meaningful choice in signing it, then it is not an adhesion contract, but it still will not be enforceable because it will

### 2. NEITHER THE CRA NOR THE PWDCRA INHIBIT ARBITRATION OF CLAIMS

As we have seen in our discussion of the *Mitsubishi* trilogy, *Gilmer*, and *Scanlon*, courts will not preclude arbitration absent an express statutory prohibition.

Neither the CRA nor the PWDCRA contains such a provision. Section 803 of the CRA, MCL 37.2803; MSA 3.548(803), which provides that the CRA "shall not be construed to diminish the right of a person to direct or immediate legal or equitable remedies in the courts of this state," does not preclude arbitration agreements—a conclusion erroneously reached in *Rushton, supra*, 225 Mich App 164-165. We agree with Justice TAYLOR's dissent in *Rushton* that § 803 merely provides that claimants under the CRA, unlike claimants under title VII, are not obliged to exhaust administrative remedies with the MDCR, but may proceed directly to court. *Id.* at 173-174. Section 803 is no more a constraint against enforcement of an arbitration agreement than was the contested provisions of the securities statutes in *McMahon* and *Rodriguez*. This is also true of the parallel provision in the PWDCRA, MCL 37.1607; MSA 3.550(607). Of course, our Legislature could have drafted these statutes to preclude predispute agreements to arbitrate civil rights employment claims, just as it may amend these statutes to preclude arbitration agreements. Because the Legislature has not done so, we will not infer that this was its intent.

---

fail the fundamental fairness test under *Renny, supra,* and our ruling here.

Furthermore, the MAA gives broad approval to arbitration agreements of all sorts, making express exceptions only for collective labor contracts and certain real estate disputes.[29] By expressly including these two categories of contract, the MAA implicitly excludes all other categories. We recognize the maxim *expressio unius est exclusio alterius*, i.e., "the express mention in a statute of one thing implies the exclusion of other similar things." *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285, 298; 565 NW2d 650 (1997).

We therefore turn to the issue of fair arbitration procedures.

### 3. PROCEDURAL FAIRNESS

As we have said, to be valid, predispute agreements to arbitrate must not waive rights under the statute and the procedures must be fair. Accordingly, because the validity and enforceability of predispute arbitration agreements in the employment discrimination context depends on the employee's opportunity for "fair adjudication," prudent employers should give careful thought to the terms and procedures of their arbitration agreements. Given the wide range of employment situations, and the narrow scope of the question before this conflicts panel, it would not be prudent for us to attempt to catalog exhaustively all the circumstances in which arbitration agreements will or will not satisfy our ruling.[30] However, a review

---

[29] MCL 600.5001, 600.5005; MSA 27A.5001, 27A.5005.

[30] The endless variety in the nature of businesses, the sophistication of employees, and the types of disputes that may be arbitrated persuade us that we cannot and should not promulgate a blueprint for all arbitrations.

of those cases that have approved arbitration of statutory claims and a review of the authorities on arbitration suggest basic elements that careful employers should include as part of the arbitral process to ensure nonwaiver and fairness.[31]

Generally, we note that the *Renny* and *Cole* courts, as well as the Dunlop Commission, the AAA, and other leading alternate dispute resolution (ADR) organizations, suggest certain baseline fundamentals to ensure fairness in an arbitral process for discrimination claims.[32] Furthermore, MCR 3.602 imposes several fairness-related requirements on arbitrators.[33] Accord-

---

In this connection, we think it appropriate to paraphrase Judge Irving R. Kaufman:

When dealing with . . . principles [of fairness], it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent. [*United States v Standard Oil Co*, 136 F Supp 345, 367 (SD NY, 1955).]

[31] For example, *Patterson, supra*, 113 F3d 838, noted generally that "[t]his vindication [of rights through arbitration] must be accomplished through the use of neutral arbitrators, adequate discovery [and], adequate types of relief . . . ." Also, the Court of Appeals for the Sixth Circuit in *Willis, supra*, 948 F2d 310, rejected the plaintiff's argument that inadequate procedural safeguards rendered her claim nonarbitrable because her claim would be arbitrated under the NYSE procedures found acceptable in *Gilmer*.

[32] The Dunlop Commission has set forth seven conditions, including a neutral arbitrator with relevant legal knowledge, a fair method of cost sharing, and a written opinion. See *Cole, supra* at 151, n 11, for additional authorities on this subject. The AAA *National Rules for the Resolution of Employment Disputes* provide for appropriate discovery, a written award, and the full range of remedies available under the relevant statute. *Cole, supra* at 148.

[33] Though MCR 3.602 is applicable only to statutory arbitration pursuant to MCL 600.5001(2); MSA 27A.5001(2), we nevertheless reference MCR 3.602 as illustrative of our Legislature's and our Supreme Court's dedication to procedural due process in arbitral hearings. The guidelines for pro-

ingly, we hold that to satisfy *Renny*'s requirement of fairness, and, where applicable, to satisfy MCR 3.602, arbitration procedures must include the following:

(1) Clear notice to the employee that he is waiving the right to adjudicate discrimination claims in a judicial forum and opting instead to arbitrate these claims. *Renny, supra* at 437.[34]

(2) The right to representation by counsel, MCR 3.602(G).

(3) A neutral arbitrator. MCR 3.602(J)(1)(b) provides that arbitration awards shall be vacated if there was "evident partiality by an arbitrator, appointed as a neutral." Additionally, MCR 3.602(E)(1) requires that the arbitrator "be sworn to hear and fairly consider the matters submitted and to make a just award according to his or her best understanding."

(4) Reasonable discovery. MCR 3.602(F)(2) contemplates discovery by providing that the arbitrator may permit the taking of depositions for use of evidence. Arbitrators also have subpoena power pursuant to MCR 2.506. MCR 3.602(F)(1).

(5) A fair arbitral hearing. As stated above, MCR 3.602(E)(1) requires arbitrators to swear to hear and decide the matter fairly. MCR 3.602(F) affords the

---

cedural fairness we set forth are accordingly deduced from and are peculiarly applicable to our common-law tradition of arbitration, *Renny, Cole,* and *Gilmer*; additionally, some of these guidelines mirror the MCR 3.602 provisions.

[34] The enforceability of an arbitration agreement may, in some circumstances, turn on whether the employee was given adequate notice and knowingly waived his right to litigate claims in court. *Kummetz v Tech Mold, Inc,* 152 F3d 1153 (CA 9, 1998); *Prudential Ins Co of America v Lai,* 42 F3d 1299 (CA 9, 1994). Without adopting the reasoning of *Kummetz* or *Lai,* we would note that employers should be aware that arbitration agreements may be challenged on principles such as adequate notice and knowing waiver.

arbitrator subpoena powers, so that parties will be able to summon witnesses.

Unlike the court in *Cole, supra* at 151-154, we will not include, among the fairness requirements, a rule that the employer must pay the fees of the arbitrator and arbitration service. However, as a practical matter, claimants will have the opportunity to shift these fees to the employer. MCR 3.602(M) provides:

> The costs of the [arbitration] proceedings may be taxed as in civil actions, and, if provision for the fees and expenses of the arbitrator has not been made in the award, the court may allow compensation for the arbitrator's services as it deems just. The arbitrator's compensation is a taxable cost in the action.

Furthermore, both the CRA and the PWDCRA provide that the court may award complainants reasonable attorney fees. MCL 37.2802; 37.1606(3); MSA 3.548(802); 3.550(606)(3). Because, under our ruling, arbitration agreements may not waive an employee's right or remedy under the statute, this statutory provision will apply in full force to arbitration proceedings.

Just as employers should model their arbitration procedures to survive challenges based on fairness, employers must also anticipate that judicial review of arbitral awards will ensure that statutory rights are not waived and procedures are fair. To do this, it follows that judicial review here will be less deferential to the arbitrator's judgment than in the collective bargaining context.[35] Rather, we must look to the court

---

[35] Traditionally, judicial review of an arbitral award under a collective bargaining agreement is very limited. See *Steelworkers* trilogy; *Gogebic Medical Care Facility v AFSCME Local 992, AFL-CIO*, 209 Mich App 693, 696-697; 531 NW2d 728 (1995).

rule promulgated by our Supreme Court and to appellate decisions for guidance concerning the appropriate scope of judicial review of arbitral awards of employment discrimination claims.

With respect to judicial review of arbitral awards in general, our Supreme Court has promulgated court rules for approving or vacating awards. MCR 3.602(J)(1) provides that the reviewing court is required to vacate an arbitration award if:

> (a) the award was procured by corruption, fraud, or other undue means;
>
> (b) there was evident *partiality* by an arbitrator, appointed as a *neutral*, corruption of an arbitrator, or misconduct prejudicing a party's rights;
>
> (c) the arbitrator exceeded his or her powers; or
>
> (d) the arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights. [Emphasis supplied.]

Furthermore, this court rule has been interpreted to mean that certain errors of law by the arbitrator will invalidate the arbitral award. For example, in *DAIIE v Gavin*, 416 Mich 407, 433-434; 331 NW2d 418 (1982), our Supreme Court held that an arbitrator's authority is exceeded if the arbitrator makes a clear error of law:

> If the appellate judiciary has any proper function at all, it is to correct material error. In determining whether to reduce to judgment the awards of statutory arbitrators, one of the court's functions, perhaps its most important, is to determine whether the award rests upon an error of law of such materiality that it can be said that the arbitrators "exceeded their powers." Thus, in statutory arbitration, the arbitrators are not free to ignore controlling principles of

law, either intentionally or unintentionally, even with the consent of the parties, and expect an ultimate judicial imprimatur as well.

Thus, in discharging their duty, arbitrators can fairly be said to exceed their power whenever they act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law.

After articulating its rationale, the Court set forth the standard of review, which we adopt here:

The character or seriousness of an error of law which will invite judicial action to vacate an arbitration award under the formula we announce today must be *error so material or so substantial as to have governed the award, and but for which the award would have been substantially otherwise.* [*Id.* at 443 (emphasis supplied).]

This Court recently held that the *Gavin* standard of judicial review applies to review of an arbitral award in a statutory discrimination suit. In *Collins v Blue Cross Blue Shield of Michigan*, 228 Mich App 560, 567; 579 NW2d 435 (1998), the arbitrator determined that an employee who expressed homicidal ideation regarding her supervisor was entitled to the protection of disability discrimination statutes. This Court held that the arbitration award should be vacated because the arbitrator *"committed an error of law"* when he ruled that plaintiff was disabled within the meaning of the statute instead of recognizing that her homicidal ideation made her unqualified for the position.[36] *Id.* at 568 (emphasis supplied).

---

[36] Initially, a federal district court decided that the arbitrator made no error of law and confirmed the arbitration award. *Collins v Blue Cross Blue Shield of Michigan*, 916 F Supp 638 (ED Mich, 1995). Subsequently, the district court's judgment was vacated for want of subject-matter juris-

Accordingly, we hold that a predispute agreement to arbitrate a statutory employment discrimination claim will be reviewed under the standard enunciated by our Supreme Court in *Gavin*.[37] Specifically, courts must vacate arbitration awards in statutory employment discrimination disputes when the arbitrator's legal error is "so material or so substantial as to have governed the award, and but for which the award would have been substantially otherwise." *Gavin, supra* at 443.

Finally, as a necessary corollary to our holding regarding the standard of judicial review, we also hold that arbitral awards must be in writing and contain findings of fact and conclusions of law. Without such a written opinion, courts would be unable to meaningfully apply the appropriate standard of review.[38]

### IV. CONCLUSION

We summarize our holding.

(1) Predispute agreements to arbitrate statutory employment discrimination claims are valid as long as

---

diction. 103 F3d 35 (CA 6, 1996). The *Gavin* standard has also been applied to a common-law medical malpractice claim, *Dohanyos v Detrex Corp (After Remand)*, 217 Mich App 171, 175; 550 NW2d 608 (1996).

[37] Similarly, the federal courts have recognized a need for heightened judicial review of arbitration awards when statutory civil rights are at stake. The *Cole* court adopted a "manifest disregard of the law" standard that is "sufficiently rigorous to ensure that arbitrators have properly interpreted and applied statutory law." *Cole, supra* at 155. Utilizing the "manifest disregard" standard, the court in *Halligan v Piper Jaffray, Inc*, 148 F3d 197 (CA 2, 1998), vacated an arbitration award where the arbitrators ignored key principles of age discrimination law and found for the defendant despite "overwhelming evidence" that the adverse employment actions were motivated by age discrimination.

[38] See *Halligan, supra* (arbitrators' failure to explain their award was a factor in court's determination that arbitrators disregarded the law).

the employee does not waive any rights or remedies under the statute[39] and the arbitral process is fair;

(2) to ensure that employees have a fair opportunity to vindicate effectively statutory rights, the arbitration procedures must include: (1) clear notice, (2) right to counsel, (3) reasonable discovery, (4) a fair hearing, and (5) a neutral arbitrator;

(3) if arbitral awards are challenged, the standard of judicial review will be the standard articulated in *Gavin, supra;* and

(4) to allow for sufficient review, arbitral awards must be in writing and contain findings of fact and conclusions of law.

We therefore remand to the trial court to determine whether plaintiff's agreement is enforceable in light of our opinion.

Remanded. We do not retain jurisdiction.

GAGE, P.J., and KELLY and O'CONNELL, JJ., concurred.

CAVANAGH, J. (*dissenting*). I respectfully dissent. I agree with Justice CAVANAGH's opinion in *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405; 550 NW2d 243 (1996),  and the majority in *Rushton v Meijer, Inc (On Remand)*, 225 Mich App 156; 570 NW2d 271 (1997),  that Michigan's longstanding public policy entitling civil rights plaintiffs to direct review of their claims in the courts cannot be abrogated by

---

[39] Including, for example, a complainant's right to attorney fees as provided by MCL 37.2802;  37.1606(3); MSA 3.548(802); 3.550(606)(3). We note further that we have already held in § I.B.1, *supra* at 157, that contracts to arbitrate employment discrimination claims must satisfy general contract rules and that those contracts that satisfy our ruling do not constitute unenforceable adhesion contracts.

contract. Accordingly, I would reverse the trial court's order granting summary disposition for defendants.

## I. MICHIGAN'S CONSTITUTION AND PUBLIC POLICY ENSURES CIVIL RIGHTS PLAINTIFFS ACCESS TO THE COURTS

In his opinion in *Heurtebise*, Justice CAVANAGH set forth in detail Michigan's "long history of stalwartly defending individuals from invidious discrimination in their pursuit of basic civil liberties . . . [and] faithfully defending an aggrieved individual's right to a judicial forum to remedy unlawful discrimination." *Heurtebise, supra* at 414. In this section, I do not attempt to duplicate Justice CAVANAGH's excellent chronicle of Michigan's vigorous and sustained protection of its citizens' civil liberties. Rather, I merely emphasize some of the significant events in Michigan's civil rights jurisprudence in order to demonstrate that requiring employees to waive prospectively their right to pursue civil rights claims in a judicial forum is inconsistent with Michigan's declared public policy.

Our Supreme Court has stated that civil rights claims should be given the "highest priority." *Holmes v Haughton Elevator Co*, 404 Mich 36, 46; 272 NW2d 550 (1978). The importance attached by the Court to the protection of civil rights is not a recent phenomenon. Over a century ago, the Supreme Court held in *Ferguson v Gies*, 82 Mich 358, 364-365; 46 NW 718 (1890), that the rule by which a restaurant owner required black persons to sit in a separate area of the restaurant violated the common law of Michigan, as well as the civil rights act of 1885, 1885 PA 130. Moreover, the Court held that the plaintiff in *Ferguson* had the right to pursue a private civil suit for damages

despite the fact that the statute did not provide a specific right of action for civil damages. The Court explained that the statute merely codified the common law, under which the plaintiff's "right of action for any injury arising from an unjust discrimination against him is just as perfect and sacred *in the courts* as that of any other citizen." *Id.* at 365 (emphasis added).

In subsequent cases, the Court reiterated that where illegal discrimination has occurred, the victim has a civil right of action for damages, even where the civil rights statute does not specifically provide a right to damages for the injury. See *St John v General Motors Corp*, 308 Mich 333, 336; 13 NW2d 840 (1944) (gender discrimination); *Bolden v Grand Rapids Operating Corp*, 239 Mich 318, 328; 214 NW 241 (1927) (racial discrimination). In *Pompey v General Motors Corp*, 385 Mich 537, 560; 189 NW2d 243 (1971), the Court held that the plaintiff could maintain a civil damage action for redress of his statutorily created right to be free from discrimination in private employment, in addition to the remedial process provided by the statute. These cases represent an exception to the general policy against implying private damage remedies when rights are created by statute, *Lamphere Schools v Lamphere Federation of Teachers*, 400 Mich 104, 126-127; 252 NW2d 818 (1977), thus highlighting the special role of the judiciary in vindicating the civil rights of Michigan citizens.

By the adoption of the 1963 Constitution, the people of Michigan further strengthened Michigan's policy of protecting its citizens from discrimination. The constitution provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation. [Const 1963, art 1, § 2.]

The 1963 Constitution recognized the importance of access to the courts in the protection of civil rights. The constitutional provision creating the Michigan Civil Rights Commission, which is charged with the enforcement of art 1, § 2, provides: "Nothing in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies *in the courts* of this state." Const 1963, art 5, § 29 (emphasis added). While the Supreme Court has stated that the clear intent of this statement was to permit claimants to seek relief in the courts without first exhausting administrative remedies, *Nummer v Dep't of Treasury*, 448 Mich 534, 550; 533 NW2d 250 (1995), I do not believe that the drafters of the constitution were solely concerned with the timing of civil rights suits. A fair inference from the various constitutional provisions is that the courts are considered especially competent to resolve civil rights claims and that "an aggrieved individual's access to judicial remedies is inseparably interwoven with the substantive civil rights and was intended by the people of Michigan to be the lifeblood of keeping those substantive civil rights alive." *Heurtebise, supra* at 435.

In sum, Michigan long ago adopted a policy of ensuring its citizens access to the courts for the redress of unlawful discrimination. Indeed, as Justice CAVANAGH stated, "the constitutionally guaranteed

direct access to a judicial forum is so interwoven with the enforcement of civil rights in Michigan that we cannot separate them without potentially harming substantive civil rights." *Id.* at 438. A contract that is contrary to public policy is illegal and void. *Federoff v Ewing*, 386 Mich 474, 481; 192 NW2d 242 (1971); *Badon v General Motors Corp*, 188 Mich App 430, 439; 470 NW2d 436 (1991). Accordingly, I would find that the parties' arbitration agreement is void as it relates to plaintiff's claims of race and handicap discrimination.[1]

## II. FEDERAL POLICY IS NOT UNIFORMLY IN FAVOR OF THE MANDATORY ARBITRATION OF CIVIL RIGHTS CLAIMS

The majority states that federal law strongly favors arbitration. However, while most federal *courts* have enforced mandatory arbitration agreements in statutory civil rights claims, this result is contrary to the intent of *Congress*. The legislative history of the 1991 Civil Rights Act, Pub L 102-166, 42 USC 1981 *et seq.*, indicates that Congress wanted to ensure the right of workers to go to court and disapproved of the mandatory predispute arbitration of statutory civil rights claims.[2]

---

[1] Judge MCDONALD recognizes that he took a contrary position in this Court's opinion in *Heurtebise v Reliable Business Computers, Inc*, 207 Mich App 308; 523 NW2d 904 (1994). However, Judge MCDONALD is now convinced that Michigan public policy prohibits mandatory predispute arbitration agreements in civil rights cases.

[2] The majority notes that despite federal court decisions enforcing predispute arbitration agreements in federal civil rights cases, Congress has not amended the statute. However, this is undoubtedly more reflective of the fact that the Republicans attained a congressional majority in the 1994 elections than it is of the intent of the Congress that passed the 1991 Civil Rights Act.

Although the 1991 Civil Rights Act contained a provision encouraging resolution of disputes through alternative dispute resolution mechanisms "[w]here appropriate and to the extent authorized by law,"[3] it is clear that Congress did not intend for arbitration of title VII claims to preclude judicial remedies. First, at the same time, Congress explicitly gave title VII plaintiffs the right to a jury trial.[4] As one court has observed: "It is . . . unlikely that the same Congress would in a single act create a new constitutionally-based right to a jury trial for Title VII plaintiffs, only to erode that right by endorsing mandatory predispute arbitration agreements."[5]

Moreover, there is direct evidence that Congress did not favor mandatory, predispute arbitration of civil rights claims. In addressing substitute language proposed by the Republican minority, the House Committee on Education and Labor stated that the majority version

> includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, *under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII* complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, *rather than being forced into compulsory arbitration,* to resolve important statutory and consti-

---

[3] This provision is codified as a historical and statutory note to 42 USC 1981.

[4] See 42 USC 1981a(c)(1).

[5] *Rosenberg v Merrill Lynch, Pierce, Fenner & Smith, Inc,* 995 F Supp 190, 205 (D Mass, 1998), aff'd 170 F3d 1 (CA 1, 1999).

tutional rights, including equal opportunity rights. American workers should not be forced to choose between their jobs and their civil rights. [HR Rep No. 40(I), 102d Cong, 1st Sess, p 104 (1991), reprinted in 1991 US Code Cong & Ad News 549 (emphasis added; citations omitted).]

Thus, Congress explicitly rejected a proposed amendment that would have permitted mandatory predispute arbitration agreements and instead chose only to encourage voluntary agreements.[6]

---

[6] Despite this legislative history, the majority of courts have not hesitated to enforce arbitration agreements in title VII claims. See, e.g., *Seus v John Nuveen & Co, Inc*, 146 F3d 175, 182-183 (CA 3, 1998); *Paladino v Avnet Computer Technologies, Inc*, 134 F3d 1054, 1062 (CA 11, 1998); *Gibson v Neighborhood Health Clinics, Inc*, 121 F3d 1126, 1130 (CA 7, 1997); *Cole v Burns Int'l Security Services*, 323 US App DC 133, 135-136; 105 F3d 1465 (1997); *Rojas v TK Communications, Inc*, 87 F3d 745, 747-748 (CA 5, 1996); *Metz v Merrill Lynch, Pierce, Fenner & Smith, Inc*, 39 F3d 1482, 1487 (CA 10, 1994); *Willis v Dean Witter Reynolds, Inc*, 948 F2d 305, 308 (CA 6, 1991); *Alford v Dean Witter Reynolds, Inc*, 939 F2d 229, 230 (CA 5, 1991). However, as one court observed:

The purpose of the Act was uniformly to *expand* employees' rights and "to *increase* the possible remedies available to civil rights plaintiffs." [*Prudential Ins Co of America v*] *Lai* [42 F3d 1299, 1304 (CA 9, 1994)] (emphasis added). It thus would be "at least a mild paradox," *Pryner*[ *v Tractor Supply Co*, 109 F3d 354, 363 (CA 7, 1997)], to conclude that in the very Act of which the "primary purpose" was "to strengthen existing protections and remedies available [to employees under Title VII]," H.R. Rep. No. 40(II) at 1, Congress "encouraged" the use of a process whereby employers condition employment on their prospective employees' surrendering their rights to a judicial forum for the resolution of all future claims of race or sex discrimination and force those employees to submit all such claims to compulsory arbitration. It seems far more plausible that Congress meant to encourage *voluntary* agreements to arbitrate—agreements such as those that employers and employees enter into after a dispute has arisen because *both* parties consider arbitration to be a more satisfactory or expeditious method of resolving the disagreement. [*Duffield v Robertson Stephens & Co*, 144 F3d 1182, 1192-1193 (CA 9, 1998).]

### III. *GILMER V INTERSTATE/JOHNSON LANE CORP*

As the majority opinion notes, the United States Supreme Court's position has relatively recently undergone a metamorphosis from a presumption against arbitration to one in favor of arbitration. The Court's previous opinion of arbitration as a second-rate means of resolving disputes is exemplified in *Alexander v Gardner-Denver Co*, 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974), and *Wilko v Swan*, 346 US 427; 74 S Ct 182; 98 L Ed 168 (1953). However, as one commentator has observed, "[s]ince 1985, [the Court] consistently has treated resistance to arbitration as a peculiarly unworthy species of bigotry."[7] I do not deny that arbitration has its virtues as a dispute-resolution mechanism, particularly when both parties voluntarily agree to its use. Nevertheless, the Court's change of heart regarding the issue was undoubtedly influenced more by the need to control crowded federal dockets than by concern for the rights of victims of unlawful discrimination.[8]

The majority relies on *Gilmer v Interstate/Johnson Lane Corp*, 500 US 20; 111 S Ct 1647; 114 L Ed 2d 26 (1991). However, because the arbitration agreement in *Gilmer* was contained in the plaintiff's registration

---

[7] Haagen, *New wineskins for new wine: The need to encourage fairness in mandatory arbitration*, 40 Ariz L R 1039, 1043 (1998).

[8] See Macneil, American Arbitration, p 172; see also *Barrentine v Arkansas-Best Freight Systems, Inc*, 450 US 728, 752; 101 S Ct 1437; 67 L Ed 2d 641 (1981) (Burger, C.J., dissenting) (stating that the Court's restriction of arbitration "runs counter to every study and every exhortation of the Judiciary, the Executive, and the Congress urging the establishment of reasonable mechanisms to keep matters of this kind out of the courts"); *Hanes Corp v Millard*, 174 US App DC 253, 266; 531 F2d 585 (1976) (stating that a policy of liberally construing arbitration agreements serves to ease court congestion).

application with the New York Stock Exchange and was not part of any specific employment contract, the Court declined to consider the broader question whether arbitration agreements between employees and their employers are enforceable with respect to such claims.[9] Thus, the Court left open the question whether arbitration clauses in employment contracts, as opposed to arbitration clauses in the securities registration application, can be used to compel arbitration of employment discrimination claims.[10]

In fact, in *Gilmer* the Supreme Court acknowledged that "all statutory claims may not be appropriate for arbitration." *Id.* at 26. The Court did not specify any statutory claims that are inappropriate for arbitration. However, it did state that arbitration agreements should not be enforced where Congress intended to preclude the waiver of a judicial forum for a particular claim. Evidence of this intention can be found in the text of the statute, its legislative history, or an "inherent conflict" between arbitration and the statute's underlying purposes. See *id.*

IV. MANDATORY PREDISPUTE ARBITRATION AGREEMENTS ARE BAD POLICY

Arbitration is essentially a streamlined method of adjudication. Parties opt for arbitration in hopes of obtaining a faster and less costly resolution of their dispute. By choosing arbitration, it is expected that

---

[9] *Gilmer, supra* at 25, n 2. The majority's failure to reach the issue was criticized by Justice Stevens, who wrote: "The Court today . . . skirts the antecedent question whether the coverage of the [Federal Arbitration] Act even extends to arbitration clauses contained in employment contracts, regardless of the subject matter of the claim at issue." *Id.* at 36 (Stevens, J., dissenting).

[10] See *id.* at 25, n 2.

the parties have considered their alternatives and decided that the benefits of arbitration outweigh the sacrifice of the protections available in the traditional legal system. However, where mandatory predispute arbitration agreements are required as a condition of employment, it is a fallacy that prospective workers make an informed, rational decision to enter into the agreements. Before a person has begun working for an employer, the possibility of suffering from unlawful discrimination in the course of employment seems extremely remote. Thus, before a dispute arises, the average employee cannot meaningfully evaluate exactly what is being waived and the practical effect of the waiver.[11]

In addition, as the Equal Employment Opportunity Commission (EEOC) and others have argued, the use of mandatory arbitration in such circumstances may result in structural biases in favor of employers. For example, the employer is much more likely to be a "repeat player," while the employee is a "one-shot player." Thus, the employer will have the advantage of familiarity with the arbitration process. When a dispute arises, the employer will have information readily available about various arbitrators and their rulings in previous cases.[12] Furthermore, the arbitrator is likely to feel subtle pressure to find in favor of employers, who represent the source of future busi-

---

[11] Grodin, *Arbitration of employment discrimination claims: Doctrine and policy in the wake of* Gilmer, 14 Hofstra Lab L J 1, 29 (1996).

[12] EEOC Policy Statement on Mandatory Binding Arbitration of Discrimination Disputes as a Condition of Employment, Notice No 915.002 (July 10, 1997), § V, pp 12-13, see http://www.eeoc.gov/docs/mandarb.txt (hereafter EEOC Policy Statement); Cole, *Incentives and arbitration: The case against enforcement of executory arbitration agreements between employers and employees,* 64 UMKC L R 449, 474-479 (1996).

ness.[13] Indeed, according to one report, seventy percent of the cases involving the mandatory arbitration of employee claims are decided in favor of the employer.[14]

Moreover, arbitration is essentially a private process and therefore does not allow development of the law. The courts play an essential role in the enforcement of civil rights laws by establishing precedents that give guidance to other companies and employees and by allowing public scrutiny of corporate policies, thus giving companies a strong incentive to eliminate discriminatory practices.[15] However, as the EEOC has observed, "The courts cannot fulfill their enforcement role if individuals do not have access to the judicial forum."[16]

Finally, the vaunted advantages of arbitration are not guaranteed. Although "arbitration can often be superior, as an empirical matter it is not clear that binding arbitration is necessarily faster, cheaper, and otherwise better than litigation."[17] Even where arbitration does result in increased speed and lower costs, the source of these benefits is often limits on discovery that may leave a plaintiff with a meritorious claim unable to prove it.[18]

---

[13] EEOC Policy Statement, § V, p 13, n 15; Cole, *supra* at 478.

[14] Haagen, *supra* at 1053.

[15] EEOC Policy Statement, § IV, pp 6-8; Garrison, *The employee's perspective: Mandatory arbitration constitutes little more than a waiver of a worker's rights*, 52 Disp Resolution J 15, 18 (Fall 1997).

[16] EEOC Policy Statement, § IV, p 8.

[17] Sternlight, *Panacea or corporate tool?: Debunking the Supreme Court's preference for binding arbitration*, 74 Wash U L Q 637, 678 (1996).

[18] Haagen, *supra.*

Significantly, while the EEOC,[19] the Commission on the Future of Worker-Management Relations (the Dunlop Commission),[20] and the National Academy of Arbitrators (NAA)[21] all support the use of *voluntary, postdispute* agreements to arbitrate, all three oppose the mandatory arbitration of disputes involving statutory rights as a condition of employment. The Dunlop Commission explained:

> The public rights embodied in state and federal employment law—such as freedom from discrimination in the workplace and minimum wage and overtime standards—are an important part of the social and economic protections of the nation. Employees required to accept binding arbitration of such disputes would face what for many would be an inappropriate choice: give up your right to go to court, or give up your job. . . .
>
> Binding arbitration agreements should not be enforceable as a condition of employment.[22]

### V. THE FEDERAL ARBITRATION ACT DOES NOT PREEMPT MICHIGAN LAW IN THIS CASE

The majority concludes that Michigan law permits the parties' arbitration agreement and therefore does not address whether the Federal Arbitration Act (FAA), 9 USC 1 *et seq.*, is implicated in this case. Because my analysis of Michigan law leads to a differ-

---

[19] EEOC Policy Statement, p 1.

[20] Commission on the Future of Worker-Management Relations, Report and Recommendations, § 4, pp 32-33, see http://www.ilr.Cornell.edu/library/e_archive/Dunlop/section4.html.

[21] Statement and Guidelines of the National Academy of Arbitrators (adopted May 21, 1997), 103 Daily Lab Rep (BNA) E-1 (May 29, 1997), see http://www.naarb.org/guidelines.html.

[22] Report of the Commission on the Future of Worker-Management Relations, pp 32-33.

ent conclusion, I now address whether, under the facts of this case, Michigan law is preempted by the FAA. I conclude that it is not.

Section 2 of the FAA provides: "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC 2. The Supreme Court has held that the FAA was intended to apply in state as well as federal courts.[23] However, § 1 of the FAA limits its coverage to commercial arbitration agreements affecting interstate, foreign, or maritime commerce. 9 USC 1. Furthermore, the act provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other

---

[23] See *Southland Corp v Keating*, 465 US 1; 104 S Ct 852; 79 L Ed 2d 1 (1984) (holding that the FAA creates a substantive rule applicable in state and federal courts and forecloses state legislative attempts to undercut the enforceability of federal contracts to arbitrate by withdrawing from arbitration a claim included in the agreement to arbitrate); see also *Perry v Thomas*, 482 US 483; 107 S Ct 2520; 96 L Ed 2d 426 (1987) (holding that the FAA preempts state legislation permitting a wage collection action to be maintained in court without regard to the existence of a private agreement to arbitrate).

Several members of the Supreme Court have pointed out that the Court has ignored congressional intent in interpreting § 2 of the FAA. Justice O'Connor has stated: "[T]he Court has abandoned all pretense of ascertaining congressional intent with respect to the Federal Arbitration Act, building instead, case by case, an edifice of its own creation." *Allied-Bruce Terminix Cos, Inc v Dobson*, 513 US 265, 283; 115 S Ct 834; 130 L Ed 2d 753 (1995) (O'Connor, J., concurring). Justice Stevens has concluded that the "Court has effectively rewritten the statute to give it a preemptive scope that Congress certainly did not intend." *Perry, supra* at 493 (Stevens, J., dissenting). Both Justice Thomas and Justice Scalia believe that the Court has ignored the language and intent underlying the FAA. See *Allied-Bruce Terminix Cos, supra* at 285-289 (Thomas, J., dissenting).

class of workers engaged in foreign or interstate commerce." *Id.*

An examination of the circumstances surrounding the passage of the FAA[24] reveals that it resulted from the desire of the business community to overturn the common-law rule that denied enforcement of agreements to arbitrate.[25] The American Bar Association (ABA) drafted a proposed federal arbitration act, which was introduced in Congress in late 1922. The proposed act was intended to apply to consensual transactions between two merchants of roughly equal bargaining power.[26] However, the bill drew the attention of the president of the International Seamen's Union, who opposed it on the basis that it would compel arbitration between seamen, as well as other transportation workers, and their employers.[27] In response, the chairman of the ABA committee responsible for drafting the act testified before a Senate subcommittee that the bill was "not intended . . . [to] be an act referring to labor disputes, at all. It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is

---

[24] For a comprehensive review of the circumstances surrounding the exemption's submission and passage, see Finkin, *"Workers' contracts" under the United States Arbitration Act: An essay in historical clarification*, 17 Berkeley J Emp & Lab L 282 (1996).

[25] Stempel, *Reconsidering the employment contract exclusion in section 1 of the Federal Arbitration Act: Correcting the judiciary's failure of statutory vision*, 1991 J Disp Resol 259, 294-295; Sternlight, *supra* at 647.

[26] Finkin, *supra* at 296; Stempel, *supra*; Sternlight, *supra*.

[27] Finkin, *supra* at 284.

all there is in this."[28] Similarly, the chairman of the
House Committee on the Judiciary stated:

> This bill simply provides for one thing, and that is to give
> an opportunity to enforce an agreement in commercial con-
> tracts and admiralty contracts—an agreement to arbitrate,
> when voluntarily placed in the document by the parties to it
> . . . . It creates no new legislation; grants no new rights,
> except a remedy to enforce an agreement in commercial
> contracts and in admiralty contracts."[29]

Secretary of Commerce Herbert Hoover, an active
supporter of the bill, wrote to the Senate subcommit-
tee: "If objection appears to the inclusion of workers'
contracts in the law's scheme, it might well be
amended by stating 'but nothing herein contained
shall apply to contracts or employment of seamen,
railroad employees, or any other class of workers
engaged in interstate or foreign commerce.' "[30]

Hoover's proposed language was adopted, and the
FAA became law on February 12, 1925. Decades later,
courts were required to determine whether the
exemption in § 1 excludes all contracts of employ-
ment, or only those employees who are engaged in
transporting goods across state or international lines.
The United States Supreme Court has yet to rule on
this issue,[31] while the federal courts of appeal are

---

[28] Finkin, *supra* at 285, quoting Hearing on S. 4213 and S. 4214 Before
the Subcomm of the Senate Comm on the Judiciary, 67th Cong, 4th Sess 9
(1923).

[29] *Cole, supra* at 466, quoting 65 Cong Rec 1931 (1924).

[30] Finkin, *supra,* at 297, quoting Letter from Herbert Hoover, Secretary
of the Department of Commerce, to Senator Thomas Sterling (Jan. 31,
1923).

[31] In *Gilmer, supra,* the Court ruled that the exclusionary clause of § 1
did not apply because the arbitration clause at issue was contained in a
contract with the securities exchange, rather than the plaintiff's employer.

divided. The majority of circuits has adopted a narrow reading of the exclusion in § 1, finding that the exclusion applies only to workers actually engaged in interstate commerce.[32] A minority has held that the exception articulated in § 1 applies to all employment contracts.[33]

However, the currently prevailing view that the exemption applies only to those employed in commerce is flawed because it ignores the historical setting in which the FAA was passed. The reach of the commerce power in 1925 was very limited;[34] in the

---

The Court therefore decided to "leave for another day" the question whether § 1 excludes all contracts of employment from the coverage of the FAA. *Id.* at 25, n 2.

[32] See *McWilliams v Logicon, Inc*, 143 F3d 573, 576 (CA 10, 1998); *Patterson v Tenet Healthcare, Inc*, 113 F3d 832, 835-837 (CA 8, 1997); *Asplundh Tree Expert Co v Bates*, 71 F3d 592, 600-601 (CA 6, 1995); *Miller Brewing Co v Brewery Workers Local Union No 9, AFL-CIO*, 739 F2d 1159, 1162 (CA 7, 1984); *Erving v Virginia Squires Basketball Club*, 468 F2d 1064, 1069 (CA 2, 1972); *Dickstein v duPont*, 443 F2d 783, 785 (CA 1, 1971); *Tenney Engineering, Inc v United Electrical, Radio & Machine Workers of America, Local 437*, 207 F2d 450, 452-453 (CA 3, 1953).

We recognize that a panel of this Court recently adopted the majority view and held that "the exclusionary provision in 9 USC 1 is limited to employees directly engaged in the movement of goods in interstate commerce." *DeCaminada v Coopers & Lybrand, LLP*, 232 Mich App 492, 499; 591 NW2d 364 (1998). However, for the reasons discussed in this opinion, we believe that this interpretation is erroneous.

[33] See *Craft v Campbell Soup Co*, 161 F3d 1199, 1206 (CA 9, 1998); see also *United Electrical, Radio & Machine Workers v Miller Metal Products*, 215 F2d 221, 224 (CA 4, 1954) (questioning the narrow interpretation of § 1). Justice Stevens has opined that arbitration clauses contained in employment contracts are specifically exempt from the coverage of the FAA. See *Gilmer, supra* at 39-40 (Stevens, J., dissenting). Despite its decision in *Tenney, supra*, the Court of Appeals for the Third Circuit appears to have recently suggested in dictum that all employment contracts are exempted. See *Pritzker v Merrill Lynch, Pierce, Fenner & Smith, Inc*, 7 F3d 1110, 1120 (CA 3, 1993).

[34] See generally *United States v Lopez*, 514 US 549, 584-600; 115 S Ct 1624; 131 L Ed 2d 626 (1995) (Thomas, J., concurring) (discussing the founding fathers' understanding and early judicial interpretations of the Commerce Clause).

employment context, it applied mainly to transportation workers.[35] In 1925, there was no way for Congress to anticipate that in subsequent decades the Supreme Court would dramatically expand the scope of the commerce power. Thus, when Congress enacted the FAA, it could not have intended that the statute apply to a baker in a restaurant, as in the present case, because such an employee would not have been considered to be in interstate commerce. However, as the commerce power was expanded, the exemption has expanded along with it, despite the complete lack of evidence that Congress intended the act to apply to *any* employment contracts.[36] Thus, it is now the case that "[t]he heightened judicial emphasis on the policy of the Act ignores the policy of the exemption."[37]

In sum, because plaintiff's duties did not involve interstate or foreign commerce, and because the FAA was never intended to apply to employment contracts, I would find that the Michigan law is not preempted by federal law in this case.

HOOD and MCDONALD, JJ., concurred.

---

[35] Finkin, *supra* at 298.

[36] See *id.*

[37] *Id.*